IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLASSIC HARVEST LLC,

                Plaintiff,

    v.                                 1:15-cv-2988-WSD

FRESHWORKS LLC, et al.,

                Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendant AgriFact Capital, LLC's ("AgriFact") Motion to Dissolve, or in the Alternative, Modify the Court's Temporary Restraining Order as Against AgriFact Capital, LLC [54] and AgriFact's Motion to Dismiss for Failure to State a Claim or Alternatively, to Dissolve or Modify the Injunction [72], which the Court construes together as AgriFact's Motions for Reconsideration of the September 4, 2015, "Consent Injunction and Agreed Order Establishing PACA Claims Procedure" [24], as clarified on October 22, 2015 [39].[1]

---

[1]     In view of Classic Harvest's Amended Complaint [85], AgriFact withdrew its Motion to Dismiss [72] to the extent it sought dismissal of the original Complaint for failure to state a claim. Classic Harvest's "Motion for Order Converting AgriFact's Rule 12(b)(6) Motion to Dismiss to a Rule 56 Motion for Summary Judgment" [77] is thus denied as moot.

## I.    BACKGROUND

This is an action under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a, et seq.  When perishable agricultural commodities ("Produce") are sold, PACA imposes a nonsegreated, "floating" trust, in favor of Produce sellers, on the Produce sold, products derived from the Produce, "and any receivables or proceeds from the sale of such" Produce or product derived from it. 7 U.S.C. § 499e(c)(2).  PACA requires the buyer to hold the trust assets "in trust for the benefit of all unpaid suppliers or sellers of such [Produce]," "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers . . . ."  Id.  A trust beneficiary may bring an action in federal court "to enforce payment from the trust."  7 U.S.C. § 499e(c)(5).

CRISP Holdings LLC d/b/a Fresh Roots ("CRISP") bought Produce on credit from wholesale Produce suppliers, including Plaintiff Classic Harvest, LLC ("Plaintiff" or "Classic Harvest").  CRISP then resold the Produce to its customers ("Account Debtors") on credit, generating accounts receivable ("Accounts Receivable" or "Receivables").  Under PACA, CRISP was required to hold, in trust (the "PACA Trust"), the Produce, products derived from the Produce, and the Receivables or proceeds from the sale of the Produce (the "Trust Assets"), for the

benefit of CRISP's unpaid Produce suppliers, including Classic Harvest (all together, the "PACA creditors").

On January 19, 2015, CRISP and AgriFact entered into a Factoring Agreement (the "Factoring Agreement"), under which CRISP "factored" to AgriFact certain of its Receivables in exchange for an immediate payment of 80% of the face value of the Receivable, plus another payment after AgriFact collected on the Receivable, less AgriFact's fees and expenses, and other adjustments.

The Factoring Agreement functioned, in general, as follows: CRISP offers for "sale" to AgriFact a Receivable that meets certain pre-established requirements. (Factoring Agreement § 1.10).  If AgriFact chooses to "purchase" the Receivable, CRISP "sells, transfers, and assigns" to AgriFact CRISP's "right, title and interest in" the Receivable, and AgriFact pays to CRISP an "Advance," equal to 80% of the face value of the Receivable.  (Id. §§ 2.2.2, 2.3).  At the time a Receivable is factored, AgriFact also establishes a "Reserve"— that is, approximately 20% of the face value of each Receivable.  The Reserve generally consists of "all unfunded purchase amounts,"[2] plus any outstanding fees and expenses CRISP owes to AgriFact.  (Id. § 2.4).  AgriFact collects payment on the Receivable from the Account Debtor and applies these payments first to amounts CRISP owes to

---

[2]     This would be the amount owed to CRISP by AgriFact in addition to the 80% of the face value paid.

AgriFact under the Factoring Agreement, and then pays the remaining funds, if any, to CRISP.  (Id. § 3.1).  In sum, after AgriFact collects on a Receivable, AgriFact pays to CRISP an amount equal to 20% of the face value of the Receivable, less AgriFact's fees, and, generally, subject to limited exceptions, the amounts AgriFact was ultimately unable to collect from the Account Debtor.  (See id. at § 3.5).[3]

From June 15, 2015, to August 14, 2015, Plaintiff sold Produce to CRISP valued in the total amount of $354,121.99.  Plaintiff has not been paid for the

---

[3]     At the end of each month, provided CRISP is not in default, AgriFact pays to CRISP a "Refund"—an amount equal to:
   (a) the Reserve as of the beginning of that month, *plus*
   (b) the Reserve created for each receivable purchased during that month, *minus*
   (c) the total for that month of:
      (i)   the Factoring Fee—that is, 0.063% of the face value of a receivable, multiplied by the number of days the Receivable remained unpaid;
      (ii)  Adjustments—that is, all discounts, returns, disputes, counterclaims, or short payments asserted by an Account Debtor on a receivable;
      (iii) the Indemnification Obligation—that is, any amount, up to the full face value, or any unpaid portion thereof, of a receivable that is the subject of a dispute between CRISP and the Account Debtor regarding the quantity, quality or price of goods upon which a receivable is based— to the extent AgriFact agreed to deduct it from the Refund; and
      (iv)  the Reserve for the Account Balance—that is, the Reserve for the gross amount of all unpaid Receivables—as of the first day of the following month.
(Id. § 3.5).

Produce sold.  It appears that the total amount CRISP owes to all of its unpaid PACA creditors, including Plaintiff, is $1,684,523.29.  (See [41.1] at 19-43).

To collect the amount owed to it, on August 25, 2015, Plaintiff filed its Complaint [1] asserting claims against CRISP, its principals and parent company (together, "Defendants"), for breach of their duties under PACA, and to enforce the PACA Trust.  Plaintiff also asserts, in Count VII of its Complaint, a claim against AgriFact for conversion and unlawful retention of the PACA Trust Assets. Plaintiff claims that, under the Factoring Agreement, AgriFact improperly held and collected proceeds from the Receivables which, Plaintiff claims, were subject to the PACA Trust and should have been used to pay the priority claims of CRISP's PACA creditors.

On August 26, 2015, Plaintiff moved for a preliminary injunction to enjoin Defendants from using, consuming, or otherwise dissipating the PACA Trust Assets, including making payment from those assets to any creditor, person, or entity.  (Mot. for Prelim. Inj. [5]).  Plaintiff also requested that the Court exercise *in rem* jurisdiction over the PACA Trust Assets and establish a framework for potential PACA creditors to submit their claims and share, on a *pro rata* basis, in the recovery of PACA Trust Assets.  (Id.).

On September 4, 2015, the Court entered the "Consent Injunction and Agreed Order Establishing PACA Claims Procedure" (the "September 4th Order") [24]. The September 4th Order provides that the Court exercise exclusive *in rem* jurisdiction over CRISP's PACA Trust Assets, and further provides that any creditor who seeks to assert a claim to the Trust Assets must assert its claim in this action. The September 4th Order also provides: "Pending further orders of this Court, no banking institution . . . or other organization/entity (including, without limitation, AgriFact [ ]) holding funds for [CRISP] shall pay, transfer, or permit assignment or withdrawal of any existing PACA trust assets held on behalf of [CRISP]." (Sept. 4th Order ¶ 5). The September 4th Order set October 22, 2015, for a hearing to finalize and resolve any objections to the proposed PACA Claims Procedure.

On October 13, 2015, AgriFact filed its objections to the September 4th Order. AgriFact argued, among other things, that Paragraph 5 of the September 4th Order does not apply to the Receivables, and their proceeds, that were factored to AgriFact.

On October 22, 2015, the Court conducted a hearing to confirm the proposed PACA Claims Procedure. At the hearing, the Court considered AgriFact's objections and clarified that, under the terms of the September 4th Order, AgriFact

is enjoined from transferring or otherwise expending any funds that it received

from invoices it obtained from CRISP pursuant to the Factoring Agreement (the

"Injunction").  The Court permitted AgriFact to file a motion to modify the

Injunction, including to determine whether the Receivables are Trust Assets.[4]

On October 28, 2015, and November 13, 2015, AgriFact moved for

reconsideration of the Injunction.

On December 3, 2015, Plaintiff filed its Amended Complaint.  Although the

Amended Complaint addresses the pleading deficiencies AgriFact asserted in its

Motion to Dismiss, the parties continue to disagree on whether the Receivables,

and their proceeds, are Trust Assets.

AgriFact contends that it is entitled to keep the Receivables, and their

proceeds, because it purchased the Receivables from CRISP, the purchase was

_____

[4]      The Court also determined that the proposed PACA Claims Procedure was
required to be modified and that supplemental notice was required to be issued to
CRISP's creditors.  On October 23, 2015, the Court issued a scheduling order
("October 23rd Order") [42], which modified the deadlines for the proposed PACA
Claims Procedure and directed CRISP to send to its creditors a copy of the
October 23rd Order and the Supplemental Notice of PACA Claims Procedure (the
"Supplemental Notice") [42.1].  The Supplemental Notice states that whether the
Receivables AgriFact obtained from CRISP are PACA Trust Assets may impact
the amount of funds PACA creditors may be able to recover from the PACA Trust,
that AgriFact's motion to modify the Injunction must be filed by November 13,
2015, and that any creditor who chooses to file a separate response to AgriFact's
motion must do so on or before December 4, 2015.  Classic Harvest is the only
creditor who filed a pleading addressing whether the Receivables are Trust Assets.

"commercially reasonable," and it did not breach the PACA Trust.  AgriFact thus argues that the Receivables, and any amounts collected from them, are not Trust Assets.  AgriFact argues further that, even if the Receivables are Trust Assets, the Court should modify the Injunction to reduce the amount of funds AgriFact is enjoined from using.  Plaintiff argues the Receivables were not sold to AgriFact and thus they remained PACA Trust Assets, subject to the PACA creditors' priority claims.

## II.   DISCUSSION

### A.   Legal Standard

A district court has discretion to revise or reconsider interlocutory orders at any time before final judgment has been entered.  See Fed. R. Civ. P. 54(b); see also Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1315 (11th Cir. 2000).  The Court does not reconsider its orders as a matter of routine practice.  See LR 7.2 E, NDGa.  A motion for reconsideration is appropriate only where there is: (1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact.  See Jersawitz v. People TV, 71 F. Supp. 2d 1330, 1344 (N.D. Ga. 1999); Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995), aff'd, 87 F.3d 1242 (11th Cir. 1996).  A motion for reconsideration should

not be used to present the Court with arguments already heard and dismissed, or to offer new legal theories or evidence that could have been presented in the previously-filed motion.  Bryan v. Murphy, 246 F. Supp. 2d 1256, 1259 (N.D. Ga. 2003); see also Pres. Endangered Areas, 916 F. Supp. at 1560 ("A motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court 'could have done it better' the first time.").

To be eligible for preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, a movant must establish each of the following elements: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.  See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005); Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001).  Preliminary injunctive relief is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements.  Four Seasons Hotels and Resorts v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003).  The crux of AgriFact's argument for reconsideration of the Injunction is that Plaintiff has not, and cannot, show that it is likely to succeed on the merits of its claim to

recover Trust Assets from AgriFact.

      B.     <u>PACA Framework and Third-Party Transferee Liability</u>

      PACA was enacted to regulate and "promote fair dealing" in the sale of Produce.  <u>See</u> <u>Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable</u>, 336 F.3d 410, 413 (5th Cir. 2003).  Produce sellers, "because of the need to sell their products quickly, were often unsecured creditors of buyers whose creditworthiness they were unable to evaluate before the sale."  <u>Id.</u> (citing <u>Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.</u>, 67 F.3d 1063, 1067 (2d Cir. 1995)).  "Due to a large number of defaults by the purchasers, and the sellers' status as unsecured creditors, the sellers recover, if at all, only after banks and other lenders who have obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables."  <u>Endico Potatoes</u>, 67 F.3d at 1067 (citing <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75, 77 (2d Cir. 1990); H.R. Rep. No. 543, at 3).  To "remedy such burden on commerce in [Produce] and to protect the public interest," PACA was amended to create a statutory trust for the benefit of unpaid Produce sellers.  <u>See</u> <u>id.</u>; 7 U.S.C. § 499e(c)(1).[5]

---

[5]    7 U.S.C. § 499e(c)(1) states: "It is hereby found that a burden on commerce in [Produce] is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for [Produce] purchased . . . , encumber or give lenders a security interest in, such [Produce], or on inventories of food or other products derived from such [Produce], and any

Section 499e(c)(2) imposes a nonsegreated "floating" trust on the Produce sold, products derived from the Produce, "and any receivables or proceeds from the sale of such [Produce] or product."  7 U.S.C. § 499e(c)(2).  PACA requires the Produce buyer to hold the trust assets "in trust for the benefit of all unpaid suppliers or sellers of such [Produce]," "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers . . . ."  Id.  The trust allows Produce sellers "to recover against the purchasers and puts the sellers in a position superior to all other creditors," including secured creditors.  See Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997) (citing Endico Potatoes, 67 F.3d at 1067).

The primary duty of a PACA trustee is to "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to [Produce] sellers . . . .  Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [PACA]."  See D.M. Rothman & Co., Inc. v. Korea Commercial Bank of N.Y., 411 F.3d 90, 94 (2d Cir. 2005) (quoting 7 C.F.R. § 46.46(d)(1)).  "PACA regulations define 'dissipation' as 'any act or failure to act which would result in the diversion of trust

receivables or proceeds from the sale of such [Produce] or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in [Produce] and to protect the public interest."

assets or which could prejudice or impair the ability of unpaid . . . sellers . . . to recover money owed in connection with produce transactions.'" Id. (quoting 7 C.F.R. § 46.46(a)(2)).  "Thus, to determine whether a PACA trustee's actions or omissions constitute a breach of fiduciary duty, [a court should] examine whether the trustee 'in any way encumbered the funds or rendered them less freely available to PACA creditors.'" Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 706 (2d Cir. 2007) (quoting D.M. Rothman, 411 F.3d at 99)).

General principles of trust law govern the PACA trust.  C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d 1311, 1316 (11th Cir. 1992).  A trustee may sell trust assets unless the sale breaches the trust.  See, e.g., Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d 1268, 1272 (9th Cir. 2001) (citing Restatement (Second) Of Trusts § 190).  Because a PACA trust is a nonsegregated, "floating" trust, a trustee "is permitted to convert trust assets into other property, provided that the trustee honors its obligation to 'maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to [Produce] sellers.'" Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d 591, 595-96 (4th Cir. 2010) (citing 7 C.F.R. § 46.46(b); quoting 7 C.F.R. § 46.46(d)(1)); see also Boulder Fruit, 251 F.3d at 1271 ("[N]othing in PACA or the regulations prohibits PACA trustees from attempting

to turn receivables into cash by factoring."). Thus, "a commercially reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty under PACA and 7 C.F.R. § 46.46(d)(1)—to maintain trust assets so that they are freely available to satisfy outstanding obligations to [Produce] sellers." Boulder Fruit, 251 F.3d at 1271; see also Nickey Gregory, 597 F.3d at 595-96. When a trust asset is sold, the trustee necessarily relinquishes its interest in the asset and receives cash in return for it—that is, the asset sold is converted into cash and the asset itself is no longer a trust asset. The sale is not a breach of trust because the trust asset—now the cash—is "freely available" to satisfy the trustee's outstanding obligations to its PACA creditors.

AgriFact argues that there is a "circuit split" as to how a court should interpret a factoring agreement involving PACA trust assets. AgriFact urges the Court to follow the "commercially reasonable" test applied by the Ninth Circuit in Boulder Fruit, and find that the PACA Trust has not been breached in this case because the Factoring Agreement is commercially reasonable. The Court disagrees.

In Boulder Fruit, the Ninth Circuit held that factoring agreements do not, per se, violate PACA including because, consistent with general trust principles, "a trustee can sell trust assets *unless* the sale breaches the trust." Boulder Fruit, 251

F.3d at 1272.  The court concluded that "a commercially reasonable *sale* of accounts for fair value is entirely consistent with the trustee's primary duty under PACA . . . to maintain trust assets so that they are freely available to satisfy outstanding obligations to [Produce] sellers."  Id. at 1271 (emphasis added).  In finding that the factoring agreement at issue was a "commercially reasonable" sale, the Ninth Circuit noted that "the factoring agreement allowed the [trustee] to convert invoices that were not payable for 30 days (including uncollectible and invalid invoices) into cash that [the trustee] could have used to immediately pay [PACA creditors]," and that the trustee actually received from the factor "more for the accounts than the accounts would prove to be worth."  Id. at 1272.

In Boulder Fruit, the "question before the [court was] whether [the trustee] breached the PACA trust by selling its accounts to [the factor] pursuant to the factoring agreement."  Id. at 1271; see also id. at 1272 ("The only question in this case is whether Certified breached its duty as a trustee when it sold the accounts receivable to Transfac.").  The Ninth Circuit did not decide whether the factoring agreement was, in fact, a "true sale" of trust assets—the threshold issue disputed in this case.  Put another way, the Ninth Circuit's holding that a commercially reasonable sale of trust assets does not breach the trust necessarily requires a finding that the trust assets were, in fact, sold.  See Nickey Gregory, 597 F.3d at

14

604 (whether factoring agreement was commercially reasonable was not material because Boulder Fruit "involved a true factoring agreement in which receivables were actually sold to the factor," and thus "unlike in this case, the receivables no longer remained PACA trust assets"); see also Reaves, 336 F.3d at 417 (same).

A "true sale" of trust assets facilitates funds being available to pay Produce sellers who benefit from the PACA trust.  If the sale of an invoice is a "true sale," market forces should produce a fair value for the invoice.  A willing buyer ordinarily would agree to pay for the invoice an amount of money that reflects the face value of the invoice adjusted by the risk of collection, the same risk of collection, or non-collection, that the PACA trustee had when it owned the invoice. The result is that the trustee receives payment of funds that become immediately available to pay PACA creditors protected by the trust.  A "true sale" thus facilitates the receipt of funds by the trustee of the fair market value of an invoice making available funds to pay PACA creditors.  In this way, a "true sale" facilitates payment to Produce sellers.  See Boulder Fruit, 251 F.3d at 1271.

Boulder Fruit does not, as AgriFact suggests, hold that a PACA trust is not breached as long as the transaction is "commercially reasonable."  Rather, "whether a transaction is commercially reasonable is simply one factor that may be relevant in determining whether a PACA trustee has met its ultimate burden of

15

proving that trust assets remained freely available [for the benefit of unpaid PACA creditors]."  See Coosemans, 485 F.3d at 707 ("regardless of whether the factoring agreement in this case was commercially reasonable on its face, defendants are, as a matter of law, liable to plaintiffs because the factoring agreement . . . was with a party having arguable claims of more than one million dollars against the PACA trust" and thus "the factoring agreement jeopardized the trust funds and made them unavailable for timely payment to [PACA creditors]") (citing Bonia, Inc. v. Ho, 873 F. Supp. 854, 861 (S.D.N.Y. 1995) ("relinquishing control . . . without securing payment is 'dissipation of the trust assets,'" and inconsistent with trustee's PACA duties)); see also E. Armata, Inc. v. Korea Commercial Bank, 367 F.3d 123, 133-134 (2d Cir. 2004) (trustee's use of PACA trust funds to pay commercially reasonable interest and fees to maintain a bank account with overdraft protection does not, per se, breach the PACA trust; "maintaining a checking account with 'commercially reasonable' terms may facilitate, rather than impede, fulfillment of a PACA trustee's duty 'to maintain trust assets so that they are freely available to satisfy outstanding obligations to [Produce] sellers.'").

Whether there was a commercially reasonable "true sale" of the Receivables is the core issue here.  Whether the Factoring Agreement constitutes a true sale of the Receivables determines whether AgriFact held the Receivables, and the

proceeds collected from them, as Trust Assets subject to the priority interest of the

PACA creditors.  See Nickey Gregory, 597 F.3d at 603.

C.    Analysis

AgriFact and CRISP included in the Factoring Agreement language

characterizing the transaction as a sale by CRISP of the Receivables to AgriFact.

These characterizing terms are mainly stated in the Factoring Agreement's recitals:

> Whereas; [AgriFact] intends to enter into a Factoring Agreement in
> order to execute true purchases of [CRISP's] accounts receivable at a
> discount;[6] and
>
> Whereas; under the Factoring Agreement, AgriFact intends to assume
> the Credit Risk associated with any Purchased Receivables; and
>
> Whereas; CRISP intends to enter into a Factoring Agreement with
> AgriFact in order to relieve itself of Credit Risk to fully and timely
> comply with all of its payment obligations under [PACA] and, if any
> funds thereafter remain available, to be used to reduce overhead
> through outsourcing of accounts receivable related functions and
> otherwise operate and administer its business with greater efficiency.

(Factoring Agreement at 1).  The Court notes, however, that "[r]ecitals are not a

necessary part of a contract and can only be used to explain some apparent doubt

with respect to the intended meaning of the operative or granting part of the

---

[6]    Use of the term "true purchases" reflects that the parties understood the
requirement of a true sale and attempted to structure the transaction to comply with
existing case law involving factoring agreements in the PACA context.  See
Endico Potatoes, 67 F.2d at 1068-69; Reaves, 336 F.3d at 417; Nickey Gregory,
597 F.3d at 604.

instrument." Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co., 654 F.Supp. 1419, 1441-42 (D. Del. 1987); see also, e.g., Musman v. Modern Deb, Inc., 392 N.Y.S.2d 24, 26 (N.Y. App. Div. 1977) ("Where a recital clause and an operative clause are inconsistent, the operative clause if unambiguous, should prevail."); A.S.D. v. W. Mun. Water Dist. of Riverside Cty., No. E030189, 2002 WL 31820335, at *8 (Cal. Ct. App. Dec. 17, 2002) ("[s]ince recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement;" if the recitals and operative part are inconsistent, operative part must prevail).

Whether the Factoring Agreement constitutes a commercially reasonable, true sale of the Receivables turns on "the substance of the relationship" between CRISP and AgriFact, "not simply the label attached to the transaction" by the parties. See Reaves, 336 at 414 (citing Endico Potatoes, 67 F.2d at 1068). The key is whether it was a complete purchase for value, or whether the transaction provides for something less. See Endico Potatoes, 67 F.2d at 1068. In Edico Potatoes, the Second Circuit identified factors a court may consider in evaluating the substance of a factoring agreement involving PACA trust assets, including:

> the right of the creditor to recover from the debtor any deficiency if
> the assets assigned are not sufficient to satisfy the debt, the effect on
> the creditor's right to the assets assigned if the debtor were to pay the
> debt from independent funds, whether the debtor has a right to any

funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt.

Id.  As the Second Circuit explained, "*[t]he root of all of these factors is the transfer of risk.  Where the lender has purchased the accounts receivable, the* borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor."  Id. at 1069 (emphasis added).[7]

Here, the Factoring Agreement reflects an arrangement by which AgriFact protected itself against the risk of nonpayment on the Receivables it "purchased" by limiting the circumstances under which it assumed the risk of loss, and by maintaining the ability to shift the risk of loss back to CRISP.  This assumption of less than the full risk of loss is not consistent with a true sale of the Receivables.  Although AgriFact states in the recitals that it "intends to assume the Credit Risk associated with any Purchased Receivables," the shift of credit risk is qualified and limited to "the risk of non-payment of a Purchased Receivable by an Account Debtor as a result of the financial inability to pay or creditworthiness."  (Factoring Agreement § 1.8).

---

[7]    In contrast, "[i]f the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan."  Endico Potatoes, 67 F.2d at 1069.

Even when nonpayment results from an Account Debtor's "financial inability to pay or creditworthiness," AgriFact still maintained the ability to shift the risk of loss, in whole or in part, back to CRISP based on certain circumstances. For example, if, at the time the Receivable was created, "notice of bankruptcy, insolvency, or adverse material change of the Account Debtor ha[d] been received by or [was] known to [CRISP,]" AgriFact may, in its sole discretion, deem its "purchase" of that Receivable void *ab initio*. That is, under these circumstances, the "sale" never happened. (Id. §§ 1.10, 1.12).[8]

That the credit risk is not fully assumed by AgriFact is reflected in other provisions allowing AgriFact to reduce the amount paid for the Receivables based on later-occurring events, even when nonpayment results from financial inability to pay. If CRISP knew that an Account Debtor would be unable to timely pay its current payment obligations within ninety (90) days from an invoice date, AgriFact may require an "adjustment" to the Receivable. (Id. §§ 1.16, 6.1(h), 7). "Adjustments" are "all discounts, allowances, returns, disputes, counterclaims, offsets, defenses, rights of recoupment, rights of return, warrant claims *or short payments* asserted by or on behalf of any Account Debtor with respect to any

---

[8]     This also necessarily implies that CRISP would be required to return the Advance AgriFact paid for any Receivable the "sale" of which AgriFact deemed void *ab initio*. Repayment of purchase amounts is not consistent with assumption of credit risk.

Purchased Receivable," and are debited from any amount AgriFact otherwise was

required to pay to CRISP at the end of each monthly period.  (Id. §§ 1.3, 3.5).

Under these circumstances, which necessarily occur only after factoring,[9] the risk

associated with these Receivables, even if resulting from the Account Debtor's

"financial inability to pay," was not a risk fully assumed by AgriFact.[10]

The narrow definition of "Credit Risk" in the Factoring Agreement also does

not include failure by an Account Debtor to pay a Receivable based on a dispute

over the "quantity, quality or price of goods or services upon which Purchased

Receivables are based."  (Id. § 4.1).  When this occurs, CRISP is required "to

indemnify [AgriFact], on demand, up to the full face amount, or any unpaid

portion thereof, of the Purchased Receivable.  If [CRISP] is able to resolve the

---

[9]     Because invoices must be factored within 20 days of the invoice date,
Section 6.1 effectively requires CRISP to guarantee an Account Debtor's financial
ability to pay for a significant period of time after the invoice is factored.
(Factoring Agreement §§ 1.10(a), 6.1).
[10]     These two sections limit AgriFact's assumption of credit risk even when an
Account Debtor is financially unable to pay, permitting AgriFact to either void the
purchase entirely, or reduce the amount paid for the Receivable, based on when the
Account Debtor became insolvent.  If CRISP knew, or should have known, that an
Account Debtor was insolvent at the time a Receivable was factored, AgriFact may
void its purchase entirely.  (Factoring Agreement § 1.10).  If CRISP knew, or
should have known, that an Account Debtor would become insolvent within the 90
days from the invoice date, AgriFact may reduce the amount paid for a Receivable.
(Id. §§ 6.1, 7).  That Sections 6.1 and 7 require CRISP to guarantee an Account
Debtor's financial ability to pay a Receivable for an additional period after the
Receivable is factored further supports that this transaction is not a true sale.

dispute with the Account Debtor, [CRISP] shall be entitled to retain any amounts received in excess of the amount [CRISP] has indemnified [AgriFact]." (Id.).  If not, CRISP, as a practical matter, assumes this risk of nonpayment.  A quality dispute thus results in the failure to collect on a Receivable and requires CRISP to remit funds to AgriFact to make up the shortfall, the amount of which may be the full face value of the Receivable.  Under those circumstances, there was no sale at all.

These sections support that, even after the "sale" of Receivables to AgriFact, CRISP continued to bear the risk of its customers' non-payment or underpayment on the Receivables purportedly sold to AgriFact.  AgriFact's risk was limited to certain narrow circumstances under which a customer was financially unable to pay or was not creditworthy.  Even then, the Factoring Agreement contains exceptions that further limit AgriFact's assumption of risk by allowing it to void the sale or reduce the amount paid for a Receivable.  This arrangement by which AgriFact protected itself against the risk of nonpayment on the Receivables it purchased is inconsistent with a true sale of the Receivables.  See Endico Potatoes, 67 F.2d at 1069 ("Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears

the risk of non-performance by the account debtor."); Reaves, 336 F.3d at 415

(finding similar factoring agreement was not a sale, including because

"nonrecourse sales are qualified by two exceptions that are so significant that they

essentially swallow non-recourse"); Nickey Gregory, 597 F.3d at 602 (where

trustee was required to repurchase disputed invoices and "credit risk" was limited

to insolvency, except where trustee knew account debtor may become insolvent,

agreement "effectively insulated AgriCap from loss" and was not a true sale);

compare Boulder Fruit, 251 F.3d at 1272 (factoring agreement allowed trustee "to

convert invoices that were not payable for 30 days (including uncollectible and

invalid invoices) into cash," and trustee received more for invoices than factor was

able to collect).[11, 12]  The arrangement here did not accomplish the PACA objective

---

[11]     The court in Boulder Fruit assumed that the invoices were sold.  The
question was whether the sale was "commercially reasonable," that is, whether a
purchase at 80% of the face value of the receivables was reasonable under the facts
of that case.  The factoring agreement allowed the trustee "to convert invoices that
were not payable for 30 days (including uncollectible and invalid invoices) into
cash that [the trustee] could have used to immediately pay [PACA creditors]."
Boulder Fruit, 251 F.3d at 1272.  The court ultimately found that, because the
invoices were not payable for 30 days, factoring them immediately provided
liquidity, allowing the trustee to more easily meet its payment obligations.  The
Court notes that the accounts receivable were purchased at 80% of their face value,
but ultimately the trustee "actually received . . . more for the accounts than the
accounts would prove to be worth."  Id.  This infers that the factor did not collect
on all of the accounts at their full face value, meaning it assumed the risk of
collection, a further indication that the accounts were fully sold to the factor.  See
id. (factoring agreement allowed trustee "to convert invoices that were not payable

of permitting sale transactions that enable a trustee to convert receivables into cash

by factoring.

The Court finds that the Factoring Agreement does not reflect a "true sale"

of the Accounts Receivable to AgriFact.  In the complex arrangement into which

AgriFact entered with CRISP, AgriFact significantly insulated itself from the risk

---

for 30 days *(including uncollectible and invalid invoices)* into cash that [trustee] could have used to immediately pay [PACA creditors]") (emphasis added); see also Endico Potatoes, 67 F.2d at 1069 ("Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor.").

[12]     Other provisions support that the Factoring Agreement did not constitute a true sale of the Receivables but rather was a mechanism to protect AgriFact against credit risk that it necessarily would incur if a true sale had been made.  That the amount of "outstanding" Advances is capped, and that CRISP must repay any Advances that exceed the cap, discredit AgriFact's assertion that the Advance is evidence of a true sale.  (Factoring Agreement § 2.2.2).  The fact of the Reserve also undercuts AgriFact's argument and further limits AgriFact's risk, including because the Reserve is in place to collect the Adjustments and any amounts CRISP is required to pay AgriFact in the event of a dispute related to the price, quality or quantity of goods upon which an invoice is based, and the Factoring Fee.  (Id. § 3.5).  That the Factoring Fee is calculated as a percentage of the face value of the Receivable for each day it remained unpaid—and during which period the Advance was "outstanding"—also supports that the Advance effectively functions as a loan, and the Factoring Fee is an interest payment for that loan.  (Id. §§ 3.2, 3.5).  Finally, that AgriFact would require CRISP to perfect a security lien in a "Purchased Receivable" discredits the argument that AgriFact considered the Receivables truly sold.  (Id. § 2.2.1(e)(iii); see also [41.4] at 27; [67.1] at 106-109; [79.17] at 2-5).  The "risk-minimizing features" of the Factoring Agreement, including its "reserve account," the uncertainty of the purchase price at the time of factoring, and lien and other security rights, supports that parties contemplated other than a true sale of the Receivables.  See Reaves, 336 F.3d at 417; Nickey Gregory, 597 F.3d at 603.

of loss that would result from nonpayment of Receivables it "purchased."  That risk avoidance is not consistent with a trustee's duties under PACA or the policy goals PACA seeks to accomplish.[13]  The Factoring Agreement rendered the Trust Assets less than freely available, including because AgriFact could require CRISP to refund amounts AgriFact paid to purchase the Receivables.  AgriFact was not a true purchaser of the Receivables, including because it did not fully assume the risk of nonpayment.

The Court concludes that the transaction did not function as a true sale of the Receivables.[14]  Because they remained Trust Assets, the Receivables and their

---

[13]     PACA's statutory trust provision reflects a policy decision to make the unsecured credit extended by Produce sellers superior to the position of lenders holding security interests in the Produce and the proceeds derived from its sale.  In doing so, Congress recognized the difficulty lenders might have in administering their secured loans, and found that those concerns were outweighed by other considerations:  "The Committee believes that the statutory trust requirements will not be a burden to the lending institutions.  They will be known to and considered by prospective lenders in extending credit.  The assurance the trust provision gives that [Produce] will be paid for promptly and that there is a monitoring system provided for under [PACA] will protect the interests of the borrower, the money lender, and the fruit and vegetable industry.  Prompt payment should generate trade confidence and new business which yields increased cash and receivables, the prime security factors to the money lender."  H.R. Rep. No. 98-543 at 4.

[14]     While the Factoring Agreement may be commercially reasonable in some contexts, it is not so in the PACA context and under the circumstances here.  That the value ultimately paid for an invoice was not known until after collection undercuts AgriFact's assertion that, based on payment of the Advance, the Factoring Agreement was a sale for a commercially reasonable value.  At the time an invoice was factored and the Advance was paid, the ultimate value of an invoice

proceeds were required to be made available for payment first to CRISP's unpaid

PACA creditors, including Classic Harvest.  See 7 U.S.C. § 499e(c)(2); C.H.

Robinson, 952 F.2d at 1313; Gargiulo, 131 F.3d at 999.  AgriFact is required to

disgorge PACA Trust Assets to the extent necessary to pay CRISP's unpaid PACA

creditors.  See Nickey Gregory, 597 F.3d at 603; Endico Potatoes, 67 F.3d at

1069.[15]

---

was unknown, including because it may be subject to adjustment, prove
uncollectable, or the purchase voided by AgriFact and the Receivable and its
collection risk returned completely to CRISP.  This uncertainty at the time of
factoring and payment of the Advance, coupled with the parties' ongoing
relationship and obligations, shows that the Accounts Receivable were not "freely
available" to satisfy the outstanding claims of CRISP's PACA creditors.  See
Boulder Fruit, 251 F.3d at 1271 (citing 7 C.F.R. § 46.46(d)(1)); see also
Coosemans, 485 F.3d at 706 ("Thus, to determine whether a PACA trustee's
actions or omissions constitute a breach of fiduciary duty, [a court should] examine
whether the trustee 'in any way encumbered the funds or rendered them less freely
available to PACA creditors.'") (quoting D.M. Rothman, 411 F.3d at 99).  Put
another way, the Factoring Agreement encumbered the Accounts Receivable and
impaired the ability of CRISP's PACA creditors to recover funds they were owed
as beneficiaries of the PACA Trust.  See id.

[15]     The Court notes that, if trust assets are transferred in breach of the trust—
such as when a trustee transfers proceeds from the sale of Produce to a third party,
instead of using the funds to pay its PACA creditors—the third-party transferee
may not be required to disgorge the trust assets it received in breach of the trust, if
it can show that it has some defense, such as having taken the assets as a bona fide
purchaser for value, without notice of the breach of trust.  See Nickey Gregory,
597 F.3d at 595-96; C.H. Robinson, 952 F.2d at 1313-15 ("Like any transferee,
secured lenders will be forced to return trust property they have received unless
they can establish their status as bona fide purchasers;" a bona fide purchaser of
trust assets receives the assets free of any claim by the trust beneficiary); Reaves,
336 F.3d at 413 ("Consequently, unpaid sellers are not able to recover trust

The Court finds that Plaintiff has shown a substantial likelihood of success on the merits of its claim to recover Trust Assets from AgriFact.  See Fed. R. Civ. P. 65; Schiavo, 403 F.3d at 1225-26.  To the extent AgriFact seeks to dissolve the Injunction against it, AgriFact's Motions for Reconsideration are denied.[16]

The Court concludes, however, that the Injunction is required to be modified to reflect only the amount of funds AgriFact may be required to disgorge—that is, the amount of funds necessary to satisfy in full the unpaid PACA creditors' claims, up to the limit of Trust Assets AgriFact held while the PACA creditors remained

---

proceeds conveyed to a third party if that third party received the proceed 'for value' and 'without notice of the breach of trust.'") (citing Endico Potatoes, 67 F.3d at 1068).

    Here, AgriFact consistently argues that the Factoring Agreement was a "commercially reasonable" "sale" of the Receivables, and thus the Receivables and funds AgriFact obtained from the Account Debtors, are not Trust Assets.  AgriFact refuses to acknowledge that the Factoring Agreement may have resulted in less than a "true sale" of the Receivables and that it may have received trust assets in breach of the trust.  Based on its myopic view of the Factoring Agreement, AgriFact does not appear to argue that it qualifies as a bona fide purchaser of the Trust Assets for value, and without notice of the breach of trust.

[16]    The Court also finds that Plaintiff, and the other PACA creditors, will suffer irreparable harm in the absence of the Injunction, including because the facts show that Trust Assets have been dissipated, and in view of CRISP's closing, the threatened injury of being unable to recover the Trust Assets is substantial and outweighs the potential harm to AgriFact.  The Court finds further that, because the PACA trust is intended to provide statutory protection for unpaid Produce suppliers, the protection of Trust Assets in the form of the Injunction serves the public interest.  See Schiavo, 403 F.3d at 1225-26; see also infra Section II.B.

unpaid.  See Nickey Gregory, 597 F.3d at 603, 607 n.2; Endico Potatoes, 67 F.3d

at 1069; cf. In re Gotham Provision Co., 669 F.2d 1000, 1010 (5th Cir. Unit B

1982) (applying Packers and Stockyards Act, which contains statutory trust

provision similar to PACA, stating, "[w]here the packer has given a lender a

security interest in inventories or receivables that are subject to the [ ] trust, the

unpaid cash sellers have priority over those assets and may recover the proceeds of

those receivables to the extent of the outstanding balance on the cash sales").[17]

    To the extent AgriFact argues that it could only be required to disgorge "the

limited fees" it retained, this argument ignores that the Factoring Agreement did

not function as a true sale, and thus the Receivables, and the proceeds from them,

---

[17]    The total outstanding amount of potential PACA claims is $1,684,523.29.
AgriFact asserts that CRISP's current Receivables, which have not yet been billed,
and were not factored, is $723,898.26, and that "counsel for Plaintiff has indicated
a desire to pursue an additional $1,100,000 plus claims [sic] in allegedly
unpermitted marketing fees" that an Account Debtor improperly deducted from
factored invoices."  ([54.2] at 9-10).  To the extent AgriFact contends that, based
on these amounts, there is no evidence that CRISP "cannot pay its creditors such
that claimants would have to resort to claims against AgriFact" (Id. at 9, 19-20),
AgriFact does not provide, and the Court is not aware of, any authority to support
that a PACA creditor is required to enforce the PACA Trust against certain Trust
Assets ahead of others.  Cf. Restatement (Second) of Torts § 295 (remedy for
transfer of trust assets in breach of trust is against either trustee or transferee);
Coosemans, 485 F.3d at 707 (citing 7 C.F.R. § 46.46(d)(1), (e)) ("When PACA
trust assets are tied up in litigation, or in the form of uncollected accounts
receivable, they are insufficient to satisfy the PACA liability because they are not
'freely available' for 'prompt payment' to trust beneficiaries as the PACA
regulations require.").

continued to be Trust Assets.  See Nickey Gregory, 597 F.3d at 607.  As a result, the amounts AgriFact advanced to CRISP did not reduce the value of the Trust Assets and were not freely available to satisfy the claims of unpaid PACA creditors.  Permitting AgriFact to retain amounts it collected on the Receivables after CRISP failed to pay its PACA creditors would, in effect, advance AgriFact's interest in the Trust Assets above the PACA creditors.  This is the "imbalance" PACA was intended to remedy.  See 7 U.S.C. § 499e(c)(1); Endico Potatoes, 67 F.3d at 1067.

The Court concludes that AgriFact is required to maintain funds in a separate, segregated account, sufficient to satisfy in full the unpaid PACA creditors' claims, which currently appears to total $1,684,523.29.  (See [41.1] at 19-43).  If the total amount of Trust Assets AgriFact held while the PACA creditors went unpaid is less than this amount, or if, at some point, the total outstanding amount of PACA claims that may be asserted in this action is reduced—such as after the limitation period for filing a Proof of Claim has expired—AgriFact may request a further reduction in the amount of funds it is required to maintain.[18]

---

[18]    AgriFact requests that, if the Injunction is not dissolved, the Court require Plaintiff "to procure a bond in the amount of the $11,000,000 restraint."  ([54.2] at 22-23).  AgriFact asserts that its business necessarily relies upon the availability of

III.   **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that AgriFact's Motions for Reconsideration [54, 72] are **DENIED IN PART** and **GRANTED IN PART**.  They are **DENIED** with respect to AgriFact's request to lift the Injunction imposed in the September 4th Order, as clarified by the October 22nd Order.  They are **GRANTED** with respect to AgriFact's request to modify the Injunction to reflect only the amount of funds AgriFact may be required to disgorge.  Accordingly, AgriFact shall maintain funds in a separate, segregated account, in the amount of $1,684,523.29.

**IT IS FURTHER ORDERED** that Classic Harvest's Motion for Order Converting AgriFact's Rule 12(b)(6) Motion to Dismiss to a Rule 56 Motion for Summary Judgment [77] is **DENIED AS MOOT.**

---

capital to factor receivables for its customers, and any obligation to freeze monies based on the value of the Receivables factored by CRISP would prevent AgriFact from conducting and growing its business.  (Id. at 20).  Having modified the Injunction to require AgriFact to maintain $1,684,523.29, less than one-fifth of the original amount of funds enjoined, the amount of security AgriFact requested no longer applies.  In the absence of information regarding AgriFact's assets or the factoring volume of its customers other than CRISP, the Court is unable to determine the amount of security that would be "proper to pay the costs and damages sustained" by AgriFact if AgriFact were found to have been wrongfully enjoined.  See Fed. R. Civ. P. 65(c).  The Court declines, at this time, to require Classic Harvest to give security for the Injunction.

**SO ORDERED** this 31st day of December, 2015.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE