# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CLASSIC HARVEST LLC,

                    Plaintiff,

    v.                                          1:15-cv-2988-WSD

FRESHWORKS LLC, et al.,

                    Defendants.

## OPINION AND ORDER

This matter is before the Court to evaluate claims filed in this action under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a, et seq., by creditors of Crisp Holdings, LLC d/b/a Fresh Roots ("Crisp"), who claim that they delivered, but were not paid for, produce they sold to Crisp.

The following sixteen (16) creditors have filed Proofs of Claim in this action: Market Express, Inc. ("Market Express") [158]; Williams Farms [157]; Classic Harvest, LLC ("Classic Harvest") [168]; Sunkist [169], [170]; Vaughn Foods [181]; Taylor Farms California, Inc. ("Taylor Farms") [175]; Bengard Ranch [177]; Pacific Sales Company ("Pacific Sales") [173]; D'Arrigo Brothers Company of California ("D'Arrigo") [179]; Tanimura & Antle Fresh Foods ("Tanimura") [174]; Mann Packing [176]; Church Brothers [178]; West Pak

Avocado ("West Pak") [176]; Eureka Specialties ("Eureka") [172]; Calvo Growers [80]; and Railex [182], [184].[1]  Defendant AgriFact Capital, LLC ("AgriFact") filed Objections [226], [227], [234]-[237], [244], [245], [256]-[258], [260], [261], [264]-[266], and Motions to Sustain its Objections [346]-[351], [353], [357], to each Proof of Claim.[2]

## I.    BACKGROUND

When perishable agricultural commodities ("Produce") are sold, PACA imposes a nonsegregated, "floating" trust, in favor of Produce sellers, on the Produce sold, products derived from the Produce, "and any receivables or proceeds from the sale of such" Produce or product derived from it.  7 U.S.C. § 499e(c)(2). PACA requires the buyer to hold trust assets, including funds a buyer receives from the sale of Produce, "in trust for the benefit of all unpaid suppliers or sellers

---

[1]    Proofs of Claim were filed, but later withdrawn, by Trademark Trans, Eclipse Berry Farm, Grimmway Enterprises, Inc., Taylor Farms Texas, Beaumont Juice, Inc. d/b/a Perricone Juices, and Global Tranz.

[2]    In view of AgriFact's amended motions [353], [357], AgriFact's first Motion to Sustain its Objections to Pacific Sales Company's PACA Proof of Claim [352], and first Motion to Sustain its Objection to the Remaining Claimants' Proofs of Claim [356] are denied as moot.

Beaumont Juice, Inc. d/b/a Perricone Juices withdrew its Proof of Claim and complaint in intervention [359], and AgriFact's Motion to Sustain its Objections to Beaumont Juice's PACA Proof of Claim [355] is denied as moot.

Global Tranz withdrew its Proof of Claim, and AgriFact's motion to sustain its objection to Global Tranz's Proof of Claim, contained in its Motion to Sustain its Objections to the Remaining Claimants' Proofs of Claim [357], is denied as moot.

of such [Produce]," "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers . . . ." Id. A trust beneficiary may bring an action in federal court "to enforce payment from the trust." 7 U.S.C. § 499e(c)(5).

Crisp bought Produce on credit from wholesale Produce suppliers, including Plaintiff Classic Harvest. Under PACA, Crisp was required to hold in trust (the "PACA Trust") the Produce, products derived from the Produce, and the proceeds from the sale of the Produce (the "Trust Assets"). These Trust Assets were required to be held for the benefit of Crisp's unpaid Produce suppliers, including Classic Harvest (all together, the "PACA creditors").

From June 15, 2015, to August 14, 2015, Classic Harvest sold Produce to Crisp, for which Classic Harvest has not been paid. To collect the amounts owed to it, on August 25, 2015, Classic Harvest filed its Complaint [1] asserting claims against Crisp and its principals for breach of their duties under PACA and to enforce the PACA Trust. Plaintiff also asserted a claim against AgriFact for conversion and unlawful retention of PACA Trust Assets.[3]

---

[3] On December 3, 2015, Classic Harvest filed its Amended Complaint, adding claims against AgriFact for aiding and abetting Crisp's principals' breach of fiduciary duty, unjust enrichment and replevin, and a claim against all Defendants for attorneys' fees and costs.

On September 4, 2015, the Court entered the "Consent Injunction and Agreed Order Establishing PACA Claims Procedure" [24] (the "September 4th Order"). The September 4th Order provides for the Court to exercise exclusive *in rem* jurisdiction over Crisp's PACA Trust Assets, and further provides that any creditor who seeks to assert a claim to the Trust Assets must assert its claim in this action.

On January 14, 2016, the Court confirmed the PACA claims procedure proposed in the September 4th Order, as modified by the Court's October 23, 2015, Scheduling Order. ([115]). The Court's September 4th Order sets out the procedure for (i) submitting claims in this litigation and (ii) objecting to the claims submitted:

> 27. Each creditor of [Crisp] holding a claim and alleging rights under the PACA trust, shall file with the Clerk of Court . . . on or before [March 1, 2016], a PACA Proof of Claim . . . together with any and all documents supporting its claim.
>
> . . .
>
> 31. Any objections to any PACA claims must be filed with the Clerk of Court. Any and all such objections must be filed and served on or before [April 11, 2016]. The Objection must set forth in detail all legal and factual grounds in support of . . . the objection.
>
> 32. On or before [June 13, 2016], any PACA claimant whose claim is subject to an objection may file with the Court a detailed response to any objection received. The response may include rebuttal evidence that the responding party wishes the Court to consider, if

any.  A claim, or any portion subject to an objection, will be disallowed if a valid objection is timely filed and the claimant fails to file a timely response.

33.    The claimant and the objecting party shall thereafter exercise best efforts to resolve any Objections.  In the event the claimant and the objecting party are unable to resolve such dispute or the objection is not withdrawn, the parties shall submit such dispute to the Court for summary resolution, on or before [September 8, 2016].

(September 4th Order ¶¶ 27, 31-32; October 23rd Scheduling Order [42] at 1-2;

August 8, 2016, Order [329] granting motion for extension of time).

As of the date of this Order, the total principal amount of alleged PACA

claims asserted in this case is $1,819,639.88.  (See PACA Trust Chart [321];

Withdrawal of Claim by Eclipse Berry Farm [333]; Stipulation of Dismissal by

Beaumont Juice, Inc. d/b/a Perricone Juices [359]).

Additional facts related to the parties' claims and objections are set out

below.

## II.    LEGAL STANDARD

The parties requested, and the Court permitted, limited discovery on the

PACA creditors' Proofs of Claim.  The Court thus applies the summary judgment

standard to evaluate AgriFact's objections and whether each PACA creditor has a

valid PACA claim and may recover the amount of its claim from the PACA Trust

Assets.  (See September 4th Order at ¶ 33).

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id.  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at

1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

## III.   AGRIFACT'S OBJECTIONS

### A.   Failure to Comply with the September 4th Order

#### 1.   Calavo Growers

On November 24, 2015, Calavo Growers ("Calavo") filed its Declaration in Support of the PACA Trust [80].  Calavo asserts that the current total amount past due and unpaid from Crisp is $373.50.  (Id.).  Calavo attaches an invoice, dated

August 13, 2015, for "UHP F/S CHUNKY PULP DEL PASADO," in the amount of $373.50.  (Id. at 7).[4]

On April 11, 2016, AgriFact objected to Calavo's claim, including because "depending on the processing activities involved, this produce may not [be] subject to the PACA."  (Obj. [227] at 8) (citing 7 U.S.C. § 499a(b)(4)(A) and 7 C.F.R. § 46.2(u)).[5]  Calavo did not respond to AgriFact's objection.

On September 9, 2016, AgriFact moved to sustain its objection to Calavo's claim [357].  Calavo did not respond to AgriFact's motion, and the motion is thus deemed unopposed.  See LR 7.1B, NDGa.

Calavo has not shown on the record here that the product sold—" UHP F/S CHUNKY PULP DEL PASADO"—is a "perishable agricultural commodity" the sale of which qualifies for PACA trust protection.  See 7 U.S.C. § 499a(b)(4)(A) (defining "perishable agricultural commodity" as "fresh fruits and fresh vegetables of every kind and character"); 7 C.F.R. § 46.2(u) (excluding from "fresh fruits and fresh vegetables" "those perishable fruits and vegetables which have been manufactured into articles of food of a different kind of character"); Endico

---

[4]    An attached email appears to place an order for "Avocado Pulp Chunky." ([80] at 9).

[5]    The invoice terms state "NET 30 DAYS."  ([80] at 7).  The statement in the declaration that the transaction was on "31-day written payment terms" appears to be a typographical error.  (Id. at 2).

Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063 (2d Cir. 1995) (PACA covers fresh fruits and fresh vegetables "that are in their natural form or are subject to a change in form which does not change the essential nature of the item, such as slicing, or a change which is meant only to temporarily preserve the fruit or vegetable, such as freezing or adding a preservative chemical;" frozen onion rings, breaded cauliflower, zucchini sticks, pickles, coleslaw, potato salad and other salads that contained less than 90% fresh ingredients did not qualify as "perishable agricultural commodities" under PACA; potatoes that were steam peeled, sliced and blanched to prevent discoloration qualified for PACA protection, but lost trust protection when they were sprayed with oil to prepare them for certain types of cooking, thus changing their character). Calavo failed to respond to the objection or submit any facts showing that the product that is the subject of its claim qualifies for PACA Trust protection and AgriFact's objection is sustained. (See Sept. 4th Order at ¶ 32) ("A claim, or any portion subject to an objection, will be disallowed if a valid objection is timely filed and the claimant fails to file a timely response."). Calavo's claim is denied.

### 2. Railex

On March 1, 2016,[6] Railex filed its Proof of Claim [182], using Official Bankruptcy Form 410. Railex states that the amount of its claim is $16,000, the basis for which is "services performed." (Id.). On March 2, 2016, Railex supplemented its Proof of Claim with a copy of the Stipulated Judgment that it asserts is the basis for its claim. ([184]). The Stipulated Judgment was entered on November 25, 2015, by the Superior Court of California, in Railex, LLC v. Fresh Roots, LLC, No. M130351. (Id.).[7] Railex does not provide any other information regarding that action, or the "services performed."

On April 11, 2016, AgriFact filed its Objection [236] to Railex's claim. AgriFact argues, among others, that "[u]pon information and belief, [Railex] is in the business of providing transportation services. However, such services do not qualify for PACA trust protection." (Obj. [236] at 2) (citing "R" Best Produce, Inc. v. Shulman-Rabin Mktg. Corp., 467 F.3d 238, 243 (2d Cir. 2005) & 7 U.S.C. § 499e(c)(2)). Railex did not respond to AgriFact's objection.

---

[6] Although Railex's claim was delivered to the Court on March 1, 2016, it was not docketed until March 2, 2016.

[7] The Stipulated Judgment is signed by David Gattis, a member of Fresh Roots, LLC. Both Gattis and Fresh Roots, LLC, are defendants in this action, although their specific relationship to Crisp is not clear.

On September 9, 2016, AgriFact moved to sustain its objection to Railex's claim [357]. Railex did not respond to AgriFact's motion, and the motion is deemed unopposed. See LR 7.1B, NDGa.

Railex does not assert, and there is no evidence to support, that Railex sold Produce to Crisp.[8] Accordingly, Railex does not have a right to recover under PACA in this action. See, e.g., Pacific Intern. Mktg. v. A & B Produce, 462 F.3d 279 (3d Cir. 2006) (denying transportation company's claim for costs incurred in arranging shipment of Produce to buyer; transportation company did not have a right to recover its freight charges under PACA, including because it was not a "seller, supplier or agent" who qualified for trust protection, and transaction with Produce buyer for transportation of Produce was not made "in connection with" a covered Produce transaction). Under Paragraph 32 of the Court's September 4th Order, and in the absence of any facts to show that Railex's claim is a qualified PACA claim, AgriFact's objection is sustained. (See Sept. 4th Order at ¶ 32) ("A claim, or any portion subject to an objection, will be disallowed if a valid objection is timely filed and the claimant fails to file a timely response."). Railex's claim is denied.

---

[8]    The Court agrees with AgriFact that it appears that Railex is a transportation provider. See http://railex.com/ (last visited May 25, 2017).

B.     Extension of Payment Terms

PACA makes it unlawful for any Produce buyer "to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in [Produce] to the person with whom such transaction is had . . . ." 7 U.S.C. § 499b(4). "Full payment promptly" means payment within ten (10) days after the buyer accepts the Produce, unless the parties agreed to extend the time for payment. 7 C.F.R. § 46.2(aa). Under 7 C.F.R. § 46.2(aa)(11),

> Parties who elect to use different times of payment . . . must reduce their agreement to writing before entering into the transaction and maintain a copy of the agreement in their records. If they have so agreed, then payment within the agreed upon time shall constitute "full payment promptly": Provided, That the party claiming the existence of such an agreement for time of payment shall have the burden of proving it.

7 C.F.R. § 46.2(aa)(11); see also 7 C.F.R. § 46.46(e)(1) ("The times for prompt accounting and prompt payment are set out in § 46.2(z) and (aa). Parties who elect to use different times for payment must reduce their agreement to writing before entering into the transaction and maintain a copy of their agreement in their records, and the times of payment must be disclosed on invoices, accountings, and other documents relating to the transaction.").[9] However, "[t]he maximum time for

---

[9]     Cf. 7 U.S.C. § 499e(c)(3) (seller must give the buyer written notice of the seller's intention to preserve its trust benefits within 30 calendar days "(i) after expiration of the time prescribed by which payment must be made, as set forth in

payment for a shipment to which a seller, supplier, or agent can agree, prior to the

transaction, and still be eligible for benefits under the trust is 30 days after receipt

and acceptance of the [Produce] . . . ." 7 C.F.R. § 46.46(e)(2).  After the

transaction, a seller who "has met the eligibility requirements . . . will not forfeit

eligibility under the trust by agreeing in any manner to a schedule for payment of

the past due amount or by accepting a partial payment."  7 C.F.R. § 46.46(e)(3).

"Strict compliance with PACA is required to preserve one's rights in a

PACA statutory trust."  <u>Paris Foods Corp. v. Foresite Foods, Inc.</u>, 278 F. App'x

873, 874 n.1 (2008) (citing <u>Am. Banana Co., Inc. v. Rep. Nat'l Bank of New York,

N.A.</u>, 362 F.3d 33, 42 (2d Cir. 2004)).  Sellers who offer, prior to the transaction,

payment periods longer than thirty days, are not entitled to PACA trust protection.

"If the supplier extends more generous payment terms, the underlying debt may

not be affected, but the security interest in the buyer's assets is lost."  <u>Id.</u>

In summary, PACA and its regulations "require a buyer to pay the seller

within ten days after the buyer accepts the Produce, but permit the parties to agree

in writing before the transaction to other payment periods that do not exceed thirty

---

regulations issued by the Secretary; (ii) *after expiration of such other time by
which payment must be made, as the parties have expressly agreed to in writing
before entering into the transaction*; or (iii) after the time the supplier . . . has
received notice that the payment instrument promptly presented for payment has
been dishonored.") (emphasis added).

days.  Sellers who offer payment periods longer than thirty days are not entitled to PACA trust protection."  <u>Am. Banana</u>, 362 F.3d at 43.

AgriFact argues that certain of the PACA creditors are not entitled to trust protection because, based on their pre-default course of dealing, they agreed to extend payment terms beyond the 30-day limit.  The Court disagrees.  The regulations clearly state that "[p]arties who elect to use different times for payment must reduce their agreement to writing before entering into the transaction." 7 C.F.R. §§ 46.2(aa)(11), 46.46(e)(1); <u>cf.</u> 7 U.S.C. § 499e(c)(3).  In <u>Hull Co. v. Hauser's Foods, Inc.</u>, 924 F.2d 777, 781 (8th Cir. 1991), the Eighth Circuit held that, based on the clear language of the regulations, only written extensions of payment terms, and not oral agreements, could extend payment terms beyond those specified in the parties' written agreement.  The Court stated: "oral agreements have no effect on produce sellers' trust protection."  <u>Id.</u>

In <u>In re Lombardo Fruit & Produce</u>, 12 F.3d 806 (8th Cir. 1993), the Eighth Circuit, applying <u>Hull</u>, held that the parties' course of dealing is not relevant in determining PACA trust eligibility.  The Court reasoned that "[i]f an express, oral agreement cannot be deemed to extend payment terms, we fail to see how something less than an express oral agreement—namely, the parties' course of dealing—can."  <u>Lombardo</u>, 12 F.3d at 811.  In <u>Lombardo</u>, the buyer argued that the

parties' written agreement requiring payment within thirty days was a sham because, throughout their relationship, the buyer paid within the thirty day period only once. Id. at 810. The Court found that the parties' agreement met the requirements of PACA and it was valid and enforceable under contract law. That the seller did not demand payment on time did not invalidate the contract. The Court noted that, "[i]f [the buyer] sued [the seller] for making a late payment, [the buyer's] past failures to insist upon its rights under the contract would not be a defense to late payment. Similarly, PACA does not impose an obligation on the seller to diligently enforce the agreement by, for instance, filing suit, filing for trust protection, or terminating business relations." Id.

The Third, Fifth and Seventh Circuits have also held that oral agreements or the parties' course of dealing are not effective to extend payment terms under PACA. Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc., 307 F.3d 666, 671 (7th Cir. 2002) ("[A]n oral agreement for an extension or a course of dealing allowing more than 30 days for payment will not abrogate a PACA trust.") (citations omitted); Bocchi Ams. Assocs., Inc. v. Commerce Fresh Mktg., Inc., 515 F.3d 383, 390 (5th Cir. 2008) ("We agree with the majority of circuits and adopt the rule that waiver or forfeiture of PACA trust rights by entering into an extension agreement requires an agreement in writing;" holding that "an oral

agreement will not suffice.") (citations omitted); <u>Idahoan Fresh v. Advantage Produce, Inc.</u>, 157 F.3d 197, 204-205 (3d Cir. 1998) (The parties' "failure to reduce their oral agreements with respect to the payment term to writing does not disqualify them, and they therefore are entitled to share in a pro-rata distribution of the statutory trust res until they receive payment in full."); <u>see also</u> <u>Sutherland Produce Sales, Inc. v. High Country Distr. LLC</u>, 2017 WL 782281, *6-9 (PACA and its regulations "go out of their way to make clear that a seller will be eligible for trust protection only if it uses the 10-day default term or modifies that term in writing to some other term of 30 days or fewer. . . . Because [buyer] has provided no evidence of a written agreement to extend the payment term beyond the 30-day limit, it has not raised a triable issue of fact on [seller's] PACA eligibility.").[10]

---

[10]    AgriFact relies on <u>American Banana</u> to support that a seller who agrees, orally or in writing, to a payment period beyond 30 days forfeits its PACA trust protection.  AgriFact's reliance is misplaced.  In <u>American Banana</u>, the seller and the buyer entered into an oral post-default agreement to extend payment beyond 30 days.  The Second Circuit "found nothing in the text of PACA or its regulations which requires that a provable *post-default* agreement extending a payment period beyond thirty days must, without exception, be reduced to writing before it will disqualify a seller from PACA's trust protection."  <u>Am. Banana</u>, 362 F.3d at 46.  The court thus turned to legislative history, and observed that, "[i]n view of Congress's clearly expressed intention to extend trust protection solely to cash and short-term credit transactions, we cannot interpret [the writing requirement in 7 C.F.R. § 46.46(e)(1)] to mean that parties are free to enter into agreements that violate PACA's prompt payment rules as long as they do not reduce their agreements to writing.  Rather, we conclude that a failure to reduce to writing an agreement that violates PACA, should not result in the preservation of the trust,

The Eleventh Circuit has not considered if a pre-transaction oral agreement or the parties' course of dealing affects PACA trust eligibility. In <u>In re Gotham Provision Co.</u>, 669 F.2d 1000 (5th Cir. Unit B 1982),[11] our Circuit considered the issue under the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 181, <u>et</u> <u>seq.</u> "The PACA trust provisions were modeled after those in the PSA, and Congress specifically intended that established precedents under the PSA be used to interpret PACA." <u>C.H. Robinson Co. v. Trust Co. Bank, N.A.</u>, 952 F.2d 1311, 1315 & n.2 (citing <u>In re Fresh Approach</u>, 48 B.R. 926, 931 (Bankr. N.D. Tex. 1985)). <u>Gotham</u> is instructive here.

where the same agreement, if memorialized, would have resulted in forfeiture of such protection." <u>Id.</u> at 46-47.

Where, as here, it is argued that the parties entered into a *pre-transaction* agreement to extend payment terms beyond the permissible 30 day period, PACA and its regulations are clear that "[p]arties who elect to use different times for payment must reduce their agreement to writing before entering into the transaction." 7 C.F.R. §§ 46.2(aa)(11), 46.46(e)(1); <u>cf.</u> 7 U.S.C. § 499e(c)(3); <u>see also</u> <u>United States v. Gayle</u>, 342 F.3d 89, 93-94 (2d Cir. 2003) ("Resort to authoritative legislative history may be justified where there is an open question as to the meaning of a word or phrase in a statute, or where a statute is silent on an issue of fundamental importance to its correct application."). <u>American Banana</u> simply does not apply.

The Court notes that, in 2011, after <u>American Banana</u> was decided, the PACA regulations were amended to provide that, after the transaction, a seller who has otherwise met the PACA eligibility requirements "will not forfeit eligibility under the trust by agreeing in any manner to a schedule for payment of the past due amount or by accepting a partial payment." 7 U.S.C. § 46.46(e)(3).

[11] The Eleventh Circuit adopted, as precedent, decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981. <u>Stein v. Reynolds Securities, Inc.</u>, 667 F.2d 33 (11th Cir. 1982).

In Gotham, the Court rejected the appellant's reliance on the parties' course of dealing and held that a livestock purchase is not exempt from the trust provisions of the PSA unless the buyer obtains from the seller a writing which clearly indicates that the seller has extended credit to the buyer and thereby waived trust protection. Gotham, 669 F.2d at 1007. Under the PSA, a livestock buyer is required to hold in trust for the benefit of unpaid cash sellers any livestock purchased in cash sales, inventories of meat or other products derived from such livestock, and accounts receivable or proceeds obtained through the sale of those items. Id. at 1004 (citing 7 U.S.C. § 196). Trust protection is limited to "cash sale" transactions, which the PSA defines as sales "in which the seller does not expressly extend credit to the buyer." Id. Because the PSA does not define an "express extension of credit," the Court looked to the prompt payment requirements in Section 409 of the PSA, 7 U.S.C. § 228b. Id. at 1004-1005. Under Section 409, buyers are required to pay the seller the full amount of the purchase price before the close of the next business day following the purchase and transfer of possession of livestock, unless the parties "expressly agree in writing, before such purchase or sale, to effect payment in a[nother] manner . . . ." Id. Based on the plain language of Section 409, the Court concluded that the PSA presumes that all livestock sales are cash sales unless the parties expressly agree in

writing to make the transaction a credit sale.  Id. at 1005.  The Court rejected the

appellant's argument that the cash or credit nature of a sale could be determined

based on the parties' course of dealing, including where the parties expected that

payment would occur after the end of the two-day period established by

Section 409.  Id. at 1007.  The Court reasoned that, "[a]lthough in the abstract such

a rule might have some appeal, it is not the rule that Congress selected.  To adopt

the [appellant's] view would do violence to the wording of the statute."  Id.

In view of Gotham, and the well-reasoned decisions of the Fifth, Seventh

and Eighth Circuits, the Court concludes an agreement to extend time for payment

beyond ten days is required to be in writing and entered into before the transaction.

See 7 U.S.C. §§ 46.2(aa)(11), 46.46(e)(1), (2); cf. 7 U.S.C. § 499e(c)(3).  In other

words, an agreement to extend payment terms, even if to extend payment terms

beyond the allowed 30-day period, is only effective if it is in writing.[12]  Oral

agreements and the parties' course of dealing are not sufficient to modify payment

terms.  To the extent AgriFact argues that certain PACA creditors are not entitled

---

[12]    The Court recognizes that the writing requirement seems to penalize
otherwise good business practices: the seller who agrees in writing to extend
payment terms beyond 30 days forfeits his PACA trust eligibility, while the seller
who makes the same agreement orally but fails to memorialize it in writing retains
his PACA trust eligibility.  It makes practical business sense, however, to impose
such a bright line rule to promote certainty and avoid the fact, and time, intensive
oral agreement or course of dealing analysis AgriFact proposes.

to trust protection because they agreed, orally or based on their course of dealing, to extend payment terms beyond the permitted 30-day limit, AgriFact's objection to the claims asserted by Classic Harvest, Market Express, Williams Farms, Vaughan Foods, Taylor Farms, Bengard Ranch, Pacific Sales and West Pak is overruled.

The Court next considers AgriFact's objections to the PACA creditors' claims based upon having agreed, in writing and before the transaction, to extend payment terms beyond the permissible 30-day period under PACA. AgriFact contends a claim is not PACA protected if a PACA creditor entered into an impermissible agreement.

    1.   <u>Classic Harvest</u>

AgriFact relies on a March 26, 2015, email conversation between Crisp and Classic Harvest to meet its burden to show an impermissible pre-transaction written agreement between Crisp and Classic Harvest to modify payment terms. ([348] at 12). In the email, the parties discussed amounts owed by Crisp to Classic Harvest. Linda Cunningham, President of Classic Harvest, told Crisp:

> We applied the check for $71k
>
> Attached is a summary outstanding – *please note your credit limit is set to $200k.*
>
> *We need you to please stay under $200k and within 35 days*

We need $94,007.70 next week to get you on track – this will still put you over limits, but will get it [sic] you closer

$52,294.30 by next Monday

$41,713.40 by next Wednesday

This follows the same payment schedule you did this week

If this plan doesn't work, please let me know what will

([346.3] at 16-17) (emphasis added).  Crisp responded that they are "working on a

strategy" and "not sure we can hit those numbers you are suggesting but we will

get close and continue to get closer."  (Id.).  Cunningham responded that she

"realize[s] we won't hit those numbers right away, we [sic] needed to give you an

idea of where the goal is."  (Id.).

The parties dispute whether the March 26, 2015, emails relate to past-due

amounts or constitute an agreement to extend payment terms for future purchases

beyond 30 days.  AgriFact claims that, in this email, the parties "essentially

adopted a revolving line of credit with a maximum credit facility [of]

approximately $200,000."  ([348] at 12).  Classic Harvest asserts that, in the

emails, it merely "sought to provide payment terms for past-due amounts from

Crisp," which does not affect Classic Harvest's right to payment from the PACA

Trust Assets.  ([368] at 13-14).

Even if, as AgriFact argues, the emails relate to payment terms for future purchases, the March 26, 2015, emails, are not an enforceable agreement to modify payment terms because there is no evidence that Crisp accepted Classic Harvest's "offer" of a credit limit of $200,000 and payment terms within 35 days.

Assuming that the emails evidence an agreement—a conclusion unsupported by the record—AgriFact argues that the March 26, 2015, emails would be enforceable under O.C.G.A. § 11-2-201(2), an exception to the Georgia Statute of Frauds.

Under PACA, "a formal written agreement is not required to waive the seller's rights . . . . [A]ll that is needed to evidence an agreement are writings sufficient to satisfy the applicable statute of frauds." <u>Bocchi</u>, 515 F.3d at 391 (citing <u>Patterson</u>, 307 F.3d at 671). In Georgia,

> (1) Except as otherwise provided in this Code section a contract for the sale of goods for the price of $500.00 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent . . . .

> (2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it had reason to know its contents, it satisfies the requirements of subsection (1) of this Code section against such party *unless written notice of objection to its contents is given within ten days after it is received.*

O.C.G.A. § 11-2-201 (emphasis added).

The evidence in the record shows that Crisp objected, in writing, to Classic Harvest's "offer" of a credit limit of $200,000 and payment terms within 35 days. Crisp responded, the same day, to Cunningham's email and stated that they "are working on a strategy" and are "not sure we can hit those numbers you are suggesting but we will get close and continue to get closer." ([346.3] at 16). That Crisp did not accept Classic Harvest's offer is further supported by the Declaration of Phillip Coleman, Crisp's Chief Financial Officer. In his Declaration, Coleman stated:

> I understood Cunningham to be proposing that Crisp attempt to keep its payable obligations below a $200,000 credit limit, doing so by paying the approximate $139,000 that was over 40 days overdue. Dave Gattis and I discussed this concept, but advised Cunningham that we needed the longer payment period (and corresponding higher credit limit) and therefore advised that we "were not sure we can hit those numbers you are suggesting but we will get close and continue to get closer [to the 35 day terms]."

([346.3] at 4) (alteration in original). Coleman does not recall any other discussions about payment terms, and states that "over time our discussions focused almost exclusively on moving the amount owed to below the $200,000 credit limit." (Id. at 6).[13]

---

[13] The Court notes that, where both parties are merchants, invoices for goods sold constitute written confirmation of the parties' agreement, under O.C.G.A. § 11-2-201(2). See, e.g., Dalesso v. Reliable-Trible Cee of North Jersey, Inc., 306 S.E.2d 415, 416 (Ga. Ct. App. 1983) ("[T]he trial court was justified in relying

Because Crisp objected to the credit limit and payment terms Cunningham proposed, the March 26, 2015, emails are not enforceable under O.C.G.A. § 11-2-201(2).  Compare Brooks Peanut Co., Inc. v. Great Southern Peanut, LLC, 746 S.E.2d 272, 278 (Ga. Ct. App. 2013) (Agreement satisfied Georgia statute of frauds where GSP received written confirmation the same day oral agreement was reached, GSP had reason to know of the confirmation's contents, and it was undisputed that GSP failed to object to the confirmation in writing within 10 days). AgriFact fails to show that Crisp and Classic Harvest agreed, in writing, to pay future invoices beyond 30 days, and its objection to Classic Harvest's claim is overruled.

### 2.    Market Express

AgriFact relies on an April 12, 2015, email from Crisp to Market Express to support that Crisp and Market Express entered into a written agreement to modify Market Express's payment terms.  ([347] at 6-7 n.2).  In the email, ([346.1] at 2), Crisp states that three of its oldest invoices were "skipped" by Market Express, thus making them more than 40 days past due.  Crisp ends the email by asking to

upon the invoices as written confirmation of the contract between Reliable and appellants within the meaning of O.C.G.A. § 11-2-201(2) as no written notice of objection was given to Reliable within 10 days of receipt by appellants.").  Classic Harvest's invoices state that payment terms are "Net 10," and there is no evidence to support that Crisp objected, within ten (10) days of receiving an invoice, to the payment terms listed on the invoice.

"set up a call[.]" (Id.). This email is insufficient to show a pre-transaction agreement between the parties to alter the time for payment. There is no response from Market Express indicating "acceptance" of any agreement to alter the time for payment. Because the email pertains to past-due invoices, it also is not a pre-transaction agreement between Market Express and Crisp. See 7 C.F.R. § 46.2(aa)(11). AgriFact does not present sufficient evidence to establish a written agreement between Crisp and Market Express, and its objection to Market Express's claim is overruled.

### 3. Williams Farms

AgriFact argues that the course of dealing between Williams Farms and Crisp supports that there was an agreement between them for Crisp to pay beyond 30 days. (See, e.g., [347] at 11) ("[B]y at least May 25, 2015, Crisp understood that Williams Farms was not expecting payment on produce shipped after that date within 30 days of acceptance of the produce. . . . Therefore, it cannot be disputed that [for] the seven (7) June 2015 invoices that are included in Williams' claim, . . . Williams had no expectation that it was going to be paid within 30 days."). AgriFact fails to identify any pre-transaction written agreement to extend payment terms beyond 30 days, and AgriFact's objection to Williams Farms' claim is overruled.

### 4. Vaughan Foods

AgriFact argues that there is a written agreement between Crisp and Vaughan to modify payment terms based on emails between Crisp and Vaughan during the period of March 3, 2016, through April 25, 2016. ([349] at 13). The emails, ([349.1] at 55-61), show that Crisp had "cash flow issues" and was trying to pay off debts owed to Vaughan. Crisp agreed to pay $75,000 of a past-due debt by a certain date and, when it missed that deadline, Vaughan stated "I thought we had an agreement here. What is the hold up?" (Id. at 56). AgriFact claims that "[t]his evidence demonstrates an actual agreement between Vaughan and Crisp to accept payments on 30 to 60 day terms." ([349] at 13). The emails, even assuming they constitute an agreement between Crisp and Vaughan Foods, is at most an agreement for payment of past-due debts and is not a pre-transaction written agreement between Vaughan and Crisp to extend payment terms as required under 7 C.F.R. § 46.2(aa)(11). AgriFact does not present any other evidence to support a pre-transaction written agreement between Crisp and Vaughan, and AgriFact's objection to Vaughan Foods' claim is overruled.

### 5. Taylor Farms

AgriFact argues that the course of dealing between Taylor Farms and Crisp evidences an "agreement" to extent terms of payment. (See, e.g., [350] at 11

("Although the invoices showed 21 day terms . . . [Taylor Farm] confirmed, from at least mid-2014 to [the] end of relationship Crisp did not pay Taylor Farms within 30 days."). AgriFact does not identify a pre-transaction written agreement to extend payment terms beyond 30 days and in absence of one, AgriFact's objection to Taylor Farms' claim is overruled.

>        6.    Bengard Ranch

AgriFact argues that the course of dealing between Bengard Ranch and Crisp is sufficient to show a pre-transaction extension of the time for payment. (See, e.g., [351] at 10 ("[Bengard] acknowledged that Crisp never paid within the credit terms . . . set forth on the invoice."). AgriFact again does not identify a pre-transaction written agreement to extend payment terms beyond 30 days and AgriFact's objection to Bengard Ranch's claim is overruled.

>        7.    Pacific Sales

AgriFact argues that the course of dealing between Pacific Sales and Crisp supports a pre-transaction agreement to extend payment terms. (See, e.g., [353] at 11 ("Crisp did not pay on 10 day terms, and instead Pacific Sales and Crisp developed a course of conduct allowing for sales that exceeded 30 days terms[.]"). AgriFact does not identify a pre-transaction written agreement to extend payment terms beyond 30 days, and its objection to Pacific Sales' claim is overruled.

8. West Pak

AgriFact claims that West Pak and Crisp entered into a pre-transaction written agreement to extend payment terms beyond 30 days. ([357] at 3-4). AgriFact relies on a June 5, 2015, email, (see [346.3] at 54), between Crisp and AgriFact. In it, West Pak and Crisp discussed that Crisp was past due on certain invoices, and that West Pak needed to receive $33,105.60 for payments that were past due "over 36 days." (Id.). Crisp claims the email shows that Crisp "understood that West Pak was not expecting payment on produce shipped after that date within 30 days of acceptance of the produce." (Id. ¶ 20). Based on the email, AgriFact concludes that West Pak and Crisp "entered into a written agreement . . . for payment terms beyond 30 days . . . ." ([357] at 3-4) (footnote omitted). The Court disagrees. The email AgriFact identifies concerns payment of past-due debts and it is not a pre-transaction written agreement between West Pak and Crisp to extend payment terms for future transactions. See 7 C.F.R. § 46.2(aa)(11). The email does not evidence a pre-transaction agreement to allow payment after 30 days, and AgriFact's objection to West Pak's claim is overruled.

C. Failure to disclose modified payment terms

"Where 'the parties expressly agree to a payment time period different from that established by [default],' [PACA] mandates that 'the terms of payment shall

be disclosed on invoices, accountings, and other documents relating to the

transaction.'" Bowlin & Son, Inc. v. San Joaquin Food Serv., Inc., 958 F.2d 938,

940 (9th Cir. 1992) (quoting 7 U.S.C. § 499e(c)(3)). "Failure to include [these

modified] payment terms in invoices divests the seller of trust benefits." Id.; see

also In re Atlanta Egg & Produce, Inc., 321 B.R. 746, 753 (N.D. Ga. 2005).

     1.   Market Express

AgriFact argues that Market Express cannot recover under PACA for

invoices billed to the "Fresh Roots SHORTS" account because the payment terms

listed on these invoices state "Net 15," which conflicts with the parties' written

agreement (the "May 12, 2015, Memorandum") that states "payment terms to

[Market Express] are 21 days." ([346.4] at 3). Even if, as AgriFact argues, the

May 12, 2015, Memorandum is valid and enforceable,[14] there is an issue of fact

whether it applies to invoices issued to the Fresh Roots SHORTS account. Robert

Hoch testified at his deposition that, although the payment terms on most invoices

from Market Express were 21 days, some of Market Express's later invoices show

---

[14] The parties dispute whether the May 12, 2015, Memorandum is valid, including whether it satisfied the Georgia Statute of Frauds. If the May 12, 2015, Memorandum is not valid, "the listing of payment terms other than 10 days has no legal relevance." See Atlanta Egg, 321 B.R. at 755. "No provision of [PACA] disqualifies a seller from PACA trust benefits simply because the seller unilaterally changed the payment term on the invoice to a period other than the standard 10-day period, but in no circumstance greater than 30 days." Id.

15-day payment terms "due to the shorts, because . . . [Market Express] started buying shorts for [Crisp] . . . [and] when that happened . . . [Hoch] had a meeting with Tim Harris [sic] [from Crisp] . . . [and] told him [that Market Express] had to be paid faster on those invoices because [Market Express] was paying cash." (Hoch Dep. at 20-21). Hoch stated that Harrison "said, let's earmark those, and [Crisp] will pay those in 15." (Id. at 21). The Court notes that Market Express continued issuing invoices, still containing the 21-day payment terms, to Crisp on other accounts. There is an issue of fact whether the May 12, 2015, Memorandum applies to invoices issued to the Fresh Roots SHORTS account. AgriFact's objection to recognition of these invoices as payable out of the PACA Trust requires further proceedings.

### 2. Taylor Farms

It is undisputed that Taylor Farms agreed to a 21-day payment term. It is also undisputed that Taylor Farms' invoices all state that the payment terms are 21 days. AgriFact argues, however, that Taylor Farms is denied the benefit of the PACA Trust because it failed to include the 21-day payment terms also on its bills of lading. The Court disagrees.

Under PACA, "[w]hen the parties expressly agree to a payment time period different from that established [by default], a copy of such agreement shall be filed

in the records of each party to the transaction and the terms of payment *shall be disclosed on invoices, accountings, and other documents relating to the transaction.*"  7 U.S.C. § 499e(c)(3) (emphasis added); see also 7 C.F.R. § 46.46(e)(1) ("Parties who elect to use different times for payment must reduce their agreement to writing before entering in to the transaction and maintain a copy of their agreement in their records, and the times of payment must be disclosed on invoices, accountings, and other documents relating to the transaction.").  PACA does not define "other documents," and at least one district court has held the phrase "other documents" is ambiguous.  See Nature Quality Vine Ripe Tomatoes v. Rawls Brokerage, Inc., 536 F. Supp. 2d 1259, 1266 (N.D. Ala. 2005); cf. San Joaquin, 958 F.2d at 940-41 (suggesting, but not deciding, that "other documents relating to the transaction" is ambiguous).  The court in Nature Quality held that the phrase "'other documents relating to the transaction' refers only to other documents which, like invoices and accountings, seek payment for delivered produce."  Id.  The court found that "it seems reasonable that by using the phrase 'other documents relating to the transaction,' Congress sought only to prevent a produce seller from circumventing the reach of the statute by [demanding payment] using a document with a title other than 'invoice' or 'accounting.'"  Id.

The Court finds this reasoning persuasive. Taylor Farms' bills of lading do not seek payment but simply contain the order number, destination address, shipping information, and the type and quantity of Produce sold. That the bills of lading did not recite payment terms does not violate the requirements of 7 U.S.C. § 499e(c)(3). See Nature Quality, 536 F. Supp. 2d at 1266. The documents that did seek payment did contain the terms of payment. AgriFact's objection based on some shortcoming in the bills of lading is overruled.

     D.    Charges for non-Produce items

Under PACA, the scope of a seller's right to recover from the PACA trust is defined as including "sums owing in connection with [Produce] transactions." 7 U.S.C. § 499e(c)(2). Courts have routinely found that "[h]andling, pallet, and freight charges are a necessary part of the produce transaction and therefore are deemed as included within the phrase 'sums owing in connection with' the sale of fresh fruit and produce." Lincoln Diversified, Inc. v. Mangos Plus, Inc., No. 98 CIV. 5593 RWS, 2000 WL 890198, at *2 (S.D.N.Y. July 5, 2000); Prestige Produce, Inc. v. Silver Creek, Inc., No. CV 04-491 S EJL, 2006 WL 581262, at *3 (D. Idaho Mar. 9, 2006); accord Fishgold v. OneBank & Trust Co., 43 F. Supp. 2d 346, 350 (W.D.N.Y.1999) ("[H]andling fee . . . was included on an invoice for the

shipment of produce, and appears to be related to the produce charges noted on the bill. As such, this charge is recoverable from the PACA trust.").

### 1. Pacific Sales

AgriFact argues that Pacific Sales' invoices must be reduced because they include charges for non-Produce items. Many of Pacific Sales' invoices include charges for temperature recorders and "air bags," in addition to the Produce purchased. These charges are a necessary part of the Produce transaction, Pacific Sales incurred these charges "in connection with" the Produce transaction, and these charges are permitted to be recovered from the PACA Trust Assets. See 7 U.S.C. § 499e(c)(2); Lincoln, 2000 WL 890198, at *2; Quail Valley Mktg., Inc., 60 Agric. Dec. 314 (U.S.D.A. Dec. 4, 2000) (permitting charges for temperature recorders and air bags with Produce purchased). AgriFact's objection is overruled.

### 2. Taylor Farms

Crisp and AgriFact argue that Taylor Farms is not entitled to recover from the PACA Trust Assets for Invoice Nos. 706045 and 707452, because they are for pallets only. ([212] at 3). There is no evidence in the record to support that these invoices for pallets are related to a Produce transaction. The invoices, accordingly, are not for amounts incurred "in connection with" a Produce transaction, and they cannot be paid using PACA Trust Assets. See 7 U.S.C. § 499e(c)(2); Pacific Int'l,

462 F.2d at 286 (transportation company could not recover under PACA because transaction with Produce buyer was not made "in connection with" any other transaction with buyer for the sale of Produce; transaction was for transportation charges only). AgriFact's objection to Invoice Nos. 706045 and 707452 is sustained, and these claims are not allowed.

To the extent AgriFact objects to Invoice No. 710782, that invoice is for broccoli and "spring mix," and does not include a charge for pallets. AgriFact's objection to Invoice No. 710782 is overruled.

E.    Produce not received (Market Express and Classic Harvest)[15]

1.    Market Express

Crisp[16] and AgriFact argue that Crisp did not receive the Produce at issue in the following three (3) invoices for which Market Express seeks payment: Invoice No. 1706, in the principal amount of $2,950.50; Invoice No. 1713, in the

---

[15]    AgriFact withdrew its objection to Sunkist Invoice Nos. 1505-84-01 and 154371-01. ([373] at 2 n.1).

[16]    Although Crisp objected to these Proofs of Claim, Crisp did not file a motion to sustain its objections. Rather, AgriFact adopted and incorporated Crisp's objections in its Motions. The Court notes that several of AgriFact's Motions reference the wrong invoice numbers, most likely a result of AgriFact's pattern of reasserting the same conclusory objection, with little to no factual or legal support, in each of its Motions and Replies. This conduct has increased the burden on the Court to sift through the voluminous filings in this case.

principal amount of $6,468.20;[17] and Invoice No. 1715, in the principal amount of $9,623.25.[18] Crisp and AgriFact argue that Crisp did not receive the Produce for which Invoice Nos. 1706, 1713, and 1715 were issued. They rely upon the Declaration of Phillip Coleman, Chief Financial Officer of Crisp, to support that Invoice Nos. 1706, 1713, and 1715, and the Produce for which they were issued, "were not received by Crisp or any of Crisp's customers," "were not received into the Crisp produce management software," and "cannot be tied to any Crisp billings . . . ." (Coleman Decl. [212.1]). Coleman states further that "the proofs of delivery do not bear the signature of any Crisp employee or any individual authorized to accept such produce on behalf of Crisp." (Id.).

To support that Crisp received the Produce at issue, Market Express relies upon the "initial invoice" or "manifest" for each corresponding invoice. ([367.5] at 1-6). When Market Express delivered Produce to Crisp, Crisp signed a manifest, which the delivery driver returned to Market Express. Market Express then sent an invoice to Crisp, based on the information contained in the manifest.

---

[17] The Court notes that the manifest supporting Invoice No. 1713 has a total amount of $6,462.30. ([367.5] at 4).

[18] Market Express voluntarily withdrew Invoice Nos. 1707 and 1709. ([367] at 16). AgriFact's objection to Invoice No. 2046, which was not part of Market Express's PACA Proof of Claim, appears to have been a typographical error. ([367] at 16-17; [375] at 12 n.6). AgriFact's objections to Invoice Nos. 1707, 1709, and 2046, are denied as moot.

(See Hoch Dep. [367.6] at 93). The manifests for Invoices 1706, 1713, and 1715 are signed, albeit illegibly, to indicate receipt. Hoch testified that he was "pretty sure" these manifests were signed by "Ben," one of three or four "receivers" at the delivery location. (Id. at 93-96).

The Court finds there is a genuine issue of material fact whether the Produce indicated in Invoice Nos. 1706, 1713, and 1715 was received by Crisp. Whether this Produce was received is an issue of fact. AgriFact's objection to recognition of Invoice Nos. 1706, 1713, and 1715 as payable out of the PACA Trust requires further proceedings.

### 2. Classic Harvest

Crisp and AgriFact argue that Crisp did not receive the Produce evidenced by the following twelve (12) invoices for which Classic Harvest seeks payment:

| Invoice No. | Principal Amount |
|---|---|
| 540797 | $24,328.80 |
| 540809 | $27,258.00 |
| 540846 | $29,682.90 |
| 540888 | $3,897.90 |
| 560607 | $1,636.20 |
| 560609 | $1,690.20 |
| 560618 | $2,295.60 |
| 560621 | $11,197.50 |
| 560629 | $2,976.15 |
| 560630 | $473.85 |
| 560631 | $166.50 |
| 560636 | $3,869.10 |
| Total: | $109,472.70 |

([212] at 9; [348] at 20-21).  To support that Crisp did not receive this Produce, Crisp and AgriFact rely on Coleman's assertions in his Declaration that the invoices "were not received by Crisp or any of Crisp's customers.  The invoices were not received into the Crisp produce management software, the invoices cannot be tied to any Crisp billings and the proofs of delivery do not bear the signature of any Crisp employee or any individual authorized to accept such produce on behalf of Crisp."  (Coleman Decl. [212.1]).

The invoices at issue indicate that the "sale terms" are "FOB."  The bill of lading that corresponds to each invoice is signed by the driver, who indicates that he received the Produce described and verified the count.  (See [168.4] at 15-16, 33-34, 51, 77, 84, 86, 89-94).  It is well-settled that, "in an FOB place of shipment contract, delivery occurs at the point where the goods are placed in the hands of the carrier, acting as the agent or bailee of the buyer."  See 18 Williston on Contracts § 52:11 (4th ed.); U.C.C. § 2-319.  The Court finds the delivery of the Produce for which the above invoices were issued occurred when the driver received the Produce listed in the invoices.  AgriFact's objection to Classic Harvest Invoice Nos. 540797, 540809, 540846, 540888, 560607, 560609, 560618, 560621, 560629, 560630, 560631, and 560636, is overruled.

F.    Failure to Include Proofs of Delivery (Pacific Sales, Williams Farms, Vaughan Foods, Classic Harvest, Taylor Farms and Church Brothers)

AgriFact argues that Pacific Sales, Williams Farms, Vaughan Foods, Classic Harvest, Taylor Farms and Church Brothers are not entitled to recover from the PACA Trust the amount evidenced by the following invoices:

| | |
|---|---|
| Pacific Sales Company | Invoice Nos. 2623, 2766, 3001, 3066, 3075, 3075A, 4025, 4067, 4068, 4058A and 4099 |
| Williams Farms | Invoice Nos. 52600, 52616, 52618, 52628, 52654, 52672, 52720, and 52735 |
| Vaughan Foods | Invoice Nos. 186246, 185773, 186928, 187517, 189228, 185961 and 186332 |
| Classic Harvest | Invoice Nos. 560499, 560506, 560541, 540840, and 560585 |
| Taylor Farms | Invoice Nos. 701208, 701222, and 701225 |
| Church Brothers | Invoice No. 78740 |

([212] at 5-6).

Crisp does not claim that it, or its customers, failed to receive the Produce billed in the invoices stated above.  Crisp instead conclusorily asserts that their Proofs of Claim "do not appear to contain complete and correct invoices and proofs of delivery to Crisp or its customers."  ([212] at 5-6).[19]  AgriFact fails to

---

[19]    In contrast, Crisp provided a declaration in which Coleman unequivocally and affirmatively states that Crisp did not receive the Produce billed in Market Express Invoice Nos. 1706, 1713, and 1715, and Classic Harvest Invoice

provide any authority to support that the PACA creditors are required to submit proof of delivery in the absence of a claim that the Produce was not delivered or the invoice is inaccurate.[20] Crisp does not allege, and there is no evidence to support, that the Produce billed in Pacific Sales Invoice Nos. 2623, 2766, 3001, 3066, 3075, 3075A, 4025, 4067, 4068, 4058A and 4099; Williams Farms Invoice Nos. 52600, 52616, 52618, 52628, 52654, 52672, 52720, and 52735; Vaughan Foods Invoice Nos. 186246, 185773, 186928, 187517, 189228, 185961 and 186332; Classic Harvest Invoice Nos. 560499, 560506, 560541, 540840, and 560585; Taylor Farms Invoice Nos. 701208, 701222, and 701225; or Church Brothers Invoice No 78740, was not received by Crisp or its customers. AgriFact's objection is overruled.

G.    Objections under Georgia Law to the R&J Group's Proofs of Claim

AgriFact asserts several objections, based on Georgia law, to the Proofs of Claim filed by Eureka, Tanimura, West Pak, Church Brothers, Bengard Ranch,

---

Nos. 540797, 540809, 540846, 540888, 560607, 560609, 560618, 560621, 560629, 560630, 560631 and 560636. (Coleman Decl. [212.1]; see infra. § E.1-E.2).

[20]    AgriFact's reliance on C & G Farms, Inc. v. Capstone Bus. Credit, LLC, 2011 WL 677487 (E.D. Cal. Feb. 17, 2011), is misplaced. In C & G Farms, there was evidence supporting that a report confirming receipt of Produce was always generated by the buyer upon delivery. The C & G Farms court found that, because the report was not submitted for certain transactions, there was an inference the Produce was not delivered. Here, there is no evidence to support a similar inference that the Produce was not delivered to Crisp or its customers. C & G Farms does not apply.

D'Arrigo, Pacific Sales and Vaughan (collectively, the "R&J Group"). AgriFact's objections are based on failure to comply with the following Georgia statutes: O.C.G.A. § 2-9-2, requiring a license to deal in agricultural products (Bengard Ranch and Pacific Sales); O.C.G.A. § 13-1-11, requiring notice to recover attorneys' fees (Vaughan, D'Arrigo, Tanimura, Church Brothers, West Pak, and Eureka); and O.C.G.A. § 7-4-2, limiting the rate of prejudgment interest (Vaughan, D'Arrigo, Eureka and West Pak).[21] The R&J Group argues that Georgia law does not apply to their claims because they seek recovery under PACA, and their transactions with Crisp did not occur in Georgia.

Where, as here, the Court's jurisdiction is based on federal question, and "disposition of a federal question requires reference to state law, federal courts are not bound by the forum state's choice of law rules, but are free to apply the law considered relevant to the pending controversy." In re Crist, 632 F.2d 1226, 1229 (5th Cir. 1980) (citing 1A Moore's Federal Practice P 0.325 (2d ed. 1979)) (noting Florida contacts regarding alimony agreement in bankruptcy action); see also FDIC v. Lattimore Land Corp., 656 F.2d 139, 148 n.16 (5th Cir. Unit B 1981)

---

[21] AgriFact also argues that, under O.C.G.A. § 13-7-1, Crisp is entitled to set off any amounts Vaughan owes to Crisp against amounts Crisp owes to Vaughan. Even if Georgia law applies here, AgriFact fails to show that, where PACA trust assets must be made available for all trust beneficiaries to share, pro rata, that they may be set off.

("Because it is such a federal question case where substantive law is to some extent applicable, this federal court is not necessarily compelled by prior diversity action precedent to apply the choice of law rules of the forum state . . . ."); compare Klaxon, 313 U.S. 487 (In an action based on diversity of citizenship jurisdiction, substantive legal issues must be resolved by the forum state's conflict of law rules.). To determine the relevant law "requires the exercise of an informed judgment in the balancing of all of the interests of the states with the most significant contacts in order to best accommodate the equities among the parties to the policies of those states." Vanston Bondholders Prot. Comm. v. Green, 329 U.S. 156, 162 (1946). This "need not mean that the federal rule is always applied" and our Circuit has "recognized that there may be issues which should be resolved by application of the forum state's choice of law rules even where a federal court, in a federal question case, is free to do otherwise." Lattimore, 656 F.2d at 148 n.16.

The parties' invoices do not identify the state law governing their transactions. The R&J Group argues that California choice-of-law rules should apply because California has the most significant contacts with the transactions at issue. Georgia and California both apply the traditional choice-of-law rules for contracts—*lex loci contractus*. See Convergys Corp. v. Keener, 582 S.E.2d 84, 87

(Ga. 2003) (Georgia adheres to the traditional choice-of-law rules for contract—*lex loci contractus*.); Cal. Civ. Code § 1646 ("A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."); Frontier Oil Corp. v. RLI Ins. Co., 153 Cal. App. 4th 1436, 1450 (Cal. Ct. App. 2007) (discussing the history of California Civil Code § 1646 and the rule that the law of the place a contract is to be performed should govern; noting that "numerous contemporary judicial opinions followed this rule based on the parties' presumed intention," and citing, among others, Vanzant, Jones & Co. v. Arnold, Hamilton & Johnson, 31 Ga. 210 (Ga. 1860)).[22] "Under the rule of *lex loci contractus,* the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is to be performed will apply." Fed. Ins. Co. v. Nat'l Distrib. Co., 417 S.E.2d 671, 673 (Ga. Ct. App. 1992). "[T]he determinative location is not where the contract is entered into or executed but where the last act essential to its completion is located . . . ." Hayes

---

[22]     In Frontier Oil, the California Court of Appeals held that "the choice-of-law rule in Civil Code section 1646 determines the law governing the interpretation of a contract, notwithstanding the application of the governmental interest analysis to other choice-of-law issues." 153 Cal. App. 4th at 1459.

v. Irwin, 541 F. Supp. 397, 414 (N.D. Ga. 1982); see also Monarch Brewing Co. v. George J. Meyer Mfg. Co, 130 F.2d 582, 585 (9th Cir. 1942) (applying California choice-of-law rules, finding that contract was made and performed in Wisconsin, and thus Wisconsin substantive law applied; contract was signed by buyer in California and signed by seller in Wisconsin, and machinery was sold FOB in Wisconsin, and delivered by seller to carrier in Wisconsin for transport to California).

Crisp is organized under Delaware law, with locations in California, Arkansas and Georgia. The companies in the R&J Group are in California, their contracts were entered into in California, and the Produce they sold originated in California. ([300] at 28-29). The invoices state that the Produce was "sold to" Crisp, at its California or Arkansas address. (Id.; see generally R&J Group invoices [172]-[181]). In most cases, the Produce was sold to Crisp on "F.O.B." ("free on board") terms, meaning that title transferred to Crisp, and delivery occurred, when the Produce was loaded onto the shipper's trucks in California.[23]

---

[23]     Although some of Bengard Ranch's invoices show a delivery address in Georgia, the Produce was sold F.O.B. and delivered to Crisp's carrier in California. See 7 C.F.R. § 46.43(i) (if Produce is shipped "F.O.B.," the produce sold "is to be placed free on board the boat, car, or other agency of the through land transportation at shipping point, in suitable shipping condition . . . and that buyer assumes all risk of damage and delay in transit not caused by the seller irrespective of how the shipment is billed. The buyer shall have the right of inspection at

(Id.); see 18 Williston on Contracts § 52:11 (4th ed.) ("[I]n an FOB place of shipment contract, delivery occurs at the point where the goods are placed in the hands of the carrier, acting as the agent or bailee of the buyer.").  In some instances, the Produce was delivered to Crisp's customers directly, at addresses outside of Georgia.  (Id.).  There simply is no record evidence that Georgia substantive law applies to the contracts at issue in this litigation between Crisp and the R&J Group.  See McGow, 412 F.3d at 1216; Hayes, 541 F. Supp. at 414; Monarch, 130 F.2d at 585.  AgriFact's objections, based on Georgia law, to the claims filed by Eureka, Tanimura, West Pak, Church Brothers, Bengard Ranch, D'Arrigo and Vaughan, are overruled.[24]

---

destination before the goods are paid for to determine if the produce shipped complied with the terms of the contract at time of shipment, subject to the provisions covering suitable shipping condition."); U.C.C. § 2-319(1)(a) ("when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided . . . and bear the expense and risk of putting them into the possession of the carrier"); see also 18 Williston on Contracts § 52:11 (4th ed.); Calif. Fruit Exchange v. Henry, 89 F. Supp. 580, 586 (W.D. Pa. 1950) (in FOB contract, title and risk pass to the buyer at the point of shipment; any normal deterioration losses which arise in transit would fall upon the buyer).

[24]    AgriFact failed to address the R&J Group's argument, raised in their response to AgriFact's objections [300], and their response to AgriFact's motions to sustain its objections [369], that Georgia law does not apply to their contracts with Crisp.  Under the Court's September 4th Order, AgriFact has waived any objections to the R&J Group's Proofs of Claim that it did not assert on or before April 11, 2016.  (See Sept. 4th Order at ¶¶ 31, 34).

H.    Illegality under Georgia Law (Market Express, Williams Farms and Classic Harvest)

AgriFact contends that because Market Express, Williams Farms and Classic Harvest did not hold a valid Georgia Dealer in Agricultural Products license, their contracts with Crisp are illegal and unenforceable, and they cannot recover under PACA.[25]  Even if they were required, but failed, to obtain a Georgia Dealer in Agricultural Products license, and even if this failure rendered their contracts with Crisp unenforceable under Georgia law, a claim to enforce the PACA trust does not depend on whether the parties have an enforceable contract claim under state law.  The elements of a PACA trust claim are:

---

[25]    O.C.G.A. § 2-9-2 provides: "It shall be unlawful for any dealer in agricultural products who comes within the terms of this article to engage in such business in this state without a state license issued by the Commissioner."  Under O.C.G.A. § 2-9-1, a "dealer in agricultural products" means "any person . . . or corporation engaged in the business of buying, receiving, selling, exchanging, negotiating, or soliciting the sale, resale, exchange, transfer of any agricultural products purchased from the producer or his or her agent or representative . . . ."

In Georgia, "where a statute provides that persons proposing to engage in a certain business shall procure a license before being authorized to do so, and where it appears from the terms of the statute that it was enacted not merely as a revenue measure but was intended as a regulation of such business in the interest of the public, contracts made in violation of such statute are void and unenforceable." Bowers v. Howell, 417 S.E.2d 392, 393 (Ga. Ct. App. 1992).  AgriFact has not shown that contracts made in violation of O.C.G.A. § 2-9-2 are void and unenforceable.  The cases on which AgriFact relies involve contracts by an unlicensed plumber and electrician, id., an unlicensed private employment agency, Mgmt. Search, Inc. v. Kinard, 199 S.E.2d 899 (Ga. 1973), and an unlicensed liquor merchant, Bernstein v. Peters, 22 S.E.2d 614 (Ga. Ct. App. 1942).

> (1) plaintiff is a PACA licensee; (2) plaintiff sold [Produce]; (3) the buyer was subject to the trust provisions of PACA; (4) the [Produce] traveled through interstate commerce; (5) plaintiff preserved their PACA trust rights by providing requisite notice to the buyer; and the buyer has not made full payment on at least some of the produce provided by plaintiff.

Spada Properties, Inc. v. Unified Grocers, Inc., 121 F. Supp. 3d 1070, 1077 n.2 (D. Or. 2015) (citing 7 C.F.R. 46.46; Belleza Fruit, Inc. v. Suffolk Banana Co., 2012 WL 2675066, at *8 (E.D.N.Y. July 5, 2012)).

It is well-settled that remedies under PACA are in addition to other remedies available under state law. 7 U.S.C. § 499e(b) provides that a claim for violation of PACA may be brought:

> (1) by complaint to the Secretary . . . or (2) by suit in any court of competent jurisdiction; *but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, and the provisions of this chapter are in addition to such remedies*.

7 U.S.C. § 499e(b) (emphasis added). The Eleventh Circuit has held that breach of contract, as a "common law remedy, is expressly referenced in PACA as being separate, and in addition to, a remedy under PACA." Paris Foods, 278 F. App'x at 875 (where sellers' complaint asserted only PACA claim and they litigated only PACA claim, holding that sellers could not raise common law breach of contract claim for the first time on appeal); cf. Rothenberg v. H. Rothstein & Sons, 183 F.2d 524, 528 (3d Cir. 1950) (in appeal of reparation order, where state statute

of frauds would preclude enforcement of contract in state court but contract was otherwise valid, state statute had no effect on PACA claim; stating that PACA "intends to grant a new remedy which is not dependent upon but in addition to such other remedies as may be available to the parties at common law or by the statutes of any state"); Krueger v. Acme Fruit Co., 75 F.2d 67, 68 (5th Cir. 1935) (describing PACA generally, stating that PACA "does not propose to provide an exclusive remedy for producers who sell only the agricultural commodities they raise. On the contrary, it leaves them free to sue in any court, state or federal, of competent jurisdiction; it merely gives them the right, regardless of the amount in controversy or of the lack of diversity of citizenship, to pursue an additional remedy by securing a reparation order entered by the Secretary of Agriculture.").

AgriFact fails to provide authority to support that Market Express, Williams Farms or Classic Harvest is barred from recovery from the PACA Trust Assets because they did not obtain a Georgia Dealer in Agricultural Products license and fails to otherwise show their contracts with Crisp are illegal and unenforceable. AgriFact's objections to Market Express's, Williams Farms' and Classic Harvest's claims are overruled.[26]

---

[26] Even if Georgia law applies to Bengard Ranch's and Pacific Sales' transactions with Crisp, AgriFact's objection to their claims based on illegality would be overruled for this same reason.

I.     Attorneys' Fees (Market Express and Williams Farms)[27]

AgriFact argues that Market Express and Williams Farms are not entitled to recover their attorneys' fees because they failed to provide notice required by O.C.G.A.§ 13-1-11.  O.C.G.A. § 13-1-11(a)(3) provides:

> The holder of the note or other evidence of indebtedness . . . shall, after maturity of the obligation, notify in writing the maker, endorser, or party sought to be held on said obligation that the provisions relative to payment of attorney's fees in addition to the principal and interest shall be enforced and that such maker, endorser, or party sought to be held on said obligation has ten days from the receipt of such notice to pay the principal and interest with the attorney's fees. If the maker, endorser, or party sought to be held on any such obligation shall pay the principal and interest in full before the expiration of such time, then the obligation to pay the attorney's fees shall be void and no court shall enforce the agreement.

O.C.G.A. § 13-1-11(a)(3).  It is well-settled that notice under O.C.G.A.

§ 13-1-11(a)(3) "may be given any time between maturity of the obligation and ten days prior to judgment."  Lockwood v. FDIC., 767 S.E.2d 829, 832-33 & 833 n.10 (Ga. Ct. App. 2014) (collecting cases).

On February 18, 2016, Market Express and Williams Farms sent to Crisp a letter which states the total amount of principal and interest due to Market Express and Williams Farms under their invoices, and states that "you have ten (10) days from the receipt of this Notice to pay principal and interest only, thereby avoiding

---

[27]     AgriFact withdrew its objection to Sunkist's claim for attorneys' fees. ([373] at 2 n.1).

all attorneys' fees . . . ."  (February 18, 2016, Notice [367.7] at 1-2).  The Court

finds that the February 18, 2016, Notice complies with O.C.G.A. § 13-1-11(a)(3).

AgriFact's objection on this ground is overruled.[28]

J.    Excessive Interest under Georgia Law (Market Express)

Under the terms printed on its invoices, Market Express claims interest at a

rate of 1.5% per month, or 18% annually, on the principal amount due on all of its

unpaid invoices.  AgriFact argues that, under O.C.G.A. § 7-4-2(a)(2), the

maximum allowable interest rate for any invoice the principal amount of which is

less than $3,000, is 16% per annum.  To the extent AgriFact argues that Market

Express is required to forfeit the entire amount of interest claimed on its invoices

---

[28]    To the extent AgriFact argues that Market Express's and Williams Farms'
claims for attorneys' fees must be denied because "there is no information in the
records that show Crisp was given an 'opportunity to tender the amount due' so as
to avoid the attorney fee obligation at least ten days in advance of the Claimant's
filing suit," the current version of O.C.G.A. § 13-1-11(a)(3) does not require notice
ten days before filing suit.  See O.C.G.A. § 13-1-11(a)(3); Lockwood, 767 S.E.2d
at 832-833; Gen. Elec. Credit Corp. v. Brooks, 249 S.E.2d 596, 600 (Ga. 1978)
(discussing history of statute, noting that, although early version required notice be
given 10 days before suit "to save the creditor the necessity and expense of
bringing suit at all," statute was amended in 1953 and provided "the debtor was
given the full opportunity to avoid the obligation [to pay attorneys' fees] by paying
principal and interest within 10 days of receipt of notice").
        Even if Georgia law applies to the R&J Group's PACA claims, to the extent
AgriFact argues that they are not entitled to attorneys' fees because they failed to
give notice as required under O.C.G.A. § 13-1-11, judgment has not been entered
in this case and AgriFact's argument is premature.  See Lockwood, 767 S.E.2d at
832-33 & 833 n.10.  AgriFact's objection to the R&J Group's claims for attorneys'
fees is overruled for this additional reason.

which, AgriFact asserts, violates O.C.G.A. § 7-4-2(a)(2), Market Express has agreed to reduce to 16% the amount of interest it seeks on invoices the principal amount of which is less than $3,000. AgriFact's objection is denied as moot.

K.     Interest not stated in Contract (Pacific Sales)

AgriFact argues that there is no basis for awarding interest to Pacific Sales because Pacific Sales' invoices do not state that it will charge interest on amounts past due. AgriFact fails to provide any authority to support its argument that "[i]nterest is only part of the PACA trust if the invoice's language includes the interest." ([353] at 18).

Although PACA does not specifically provide for the award of interest, it does not preclude it. Courts that have addressed whether prejudgment interest may be awarded under PACA absent a contractual right have uniformly agreed that a district court has broad discretion to award prejudgment interest to PACA trust beneficiaries, as "sums owing in connection with [the Produce] transaction," under 7 U.S.C. § 499e(c)(2). See Middle Mtn. Land & Produce Inc. v. Sound Commodities Inc., 307 F.3d 1220, 1225-1226 (9th Cir. 2002); Endico Potatoes, 67 F.3d at 1071-1072 (district court has broad discretion to fashion prejudgment interest award to PACA claimants); Morris v. Okun, Inc., 814 F. Supp. 346, 351 (S.D.N.Y. 1993) (although "there is no [fees and interest] contractual provision in

the contract, and the award of prejudgment interest and attorney's fees is therefore within the discretion of the court," prejudgment interest awarded on overdue accounts based on congressional intent in PACA); Tomato Mgmt., Corp. v. CM Produce LLC, 2014 WL 2893368, at *3 ("Congress's intent to ensure prompt payment and protect sellers of produce weighs in favor of awarding [prejudgment] interest"); cf. Rodgers v. United States, 332 U.S. 371, 373 (1947) (failure to mention interest in a federal statute permits the courts to fashion such rules in light of congressional purposes); Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004) (prejudgment interest and attorneys fees for which Produce seller and buyer had bargained for under terms of their contract were recoverable under PACA as "sums owing in connection with [Produce] transaction," including because PACA was designed to give produce sellers a meaningful opportunity to recover full payment of the amounts due for their sales" and permitting prejudgment interest was not "contrary to the statute's purpose, absurd, or 'demonstrably at odds with the intentions of the drafters'") (citing Middle Mtn., 307 F.3d at 1223-24).

The Court finds that an award of reasonable prejudgment interest, even in the absence of a contract provision requiring it, is consistent with Congress's intent to ensure prompt payment and to give Produce sellers a meaningful opportunity to

recover full payment of the amounts due for their sales under PACA.  See Rodgers, 332 U.S. at 373; Country Best, 361 F.3d at 632.  AgriFact's objection on this ground is overruled.

L.     Remaining Affirmative Defenses

AgriFact asserts that its affirmative defenses, including laches, consent and estoppel, affirmance and ratification, and failure to mitigate damages, "raise factual issues that cannot be resolved at this stage of the proceedings."  (See, e.g., [348] at 21).  The PACA claimants contend that AgriFact's affirmative defenses are not relevant to the issues currently before the Court—specifically, whether each PACA creditor has a valid PACA claim.  (See, e.g., [368] at 25; [367] at 20).  Because the parties have not fully briefed the issues, including by citing to specific facts to support their conclusory assertions, the Court does not consider AgriFact's affirmative defenses.

IV.   **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that AgriFact's first Motion to Sustain its Objections to Pacific Sales Company's PACA Proof of Claim [352], first Motion to Sustain its Objection to the Remaining Claimants [356], and Motion to Sustain

its Objections to Beaumont Juice's PACA Proof of Claim [355], are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that AgriFact's Motion to Sustain its Objections to Market Express's PACA Proof of Claim [346] is **GRANTED IN PART** and **DENIED IN PART**. AgriFact's objections to recognition, as payable out of the PACA Trust, of Market Express's (1) invoices billed to the "Fresh Roots SHORTS" account, based on failure to disclosure modified payment terms, and (2) Invoice Nos. 1706, 1713, and 1715, based on failure to show that Produce was received, require further proceedings. AgriFact's remaining objections to Market Express's Proof of Claim are **OVERRULED**.

**IT IS FURTHER ORDERED** that AgriFact's Amended and Restated Motion to Sustain its Objections to the Claims of D'Arrigo Bros. Co. of California, Tanimura & Antle Fresh Foods, Mann Packing, Church Brothers, West Pak Avocado, Eureka Specialties, Global Tranz, Railex and Calvo Growers [357], is **GRANTED IN PART** and **DENIED IN PART**. AgriFact's objections to Calavo's and Railex's Proofs of Claim are **SUSTAINED**. AgriFact's objection to Global Tranz's Proof of Claim is **DENIED AS MOOT**. AgriFact's remaining objections in this Motion are **OVERRULED**.

**IT IS FURTHER ORDERED** that AgriFact's Motions to Sustain its Objections to Williams' Farms Proof of Claim [347], Classic Harvest's PACA Proof of Claim [348], Sunkist's Proof of Claim [354], Vaughan's Proof of Claim [349], Taylor Farms' Proof of Claim [350], Bengard Ranch's Proof of Claim [351], and Pacific Sales' Proof of Claim [353], are **DENIED**.  AgriFact's objections in these Motions are **OVERRULED**.

**IT IS FURTHER ORDERED** that, on or before June 6, 2017, Counsel for Crisp shall submit to the Court an updated PACA Claims Chart, incorporating the Court's rulings contained in this Order.

**SO ORDERED** this 31st day of May, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE