# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

CLASSIC HARVEST LLC,

                Plaintiff,

     v.

FRESHWORKS LLC, et al.,

                Defendants.

1:15-cv-2988-WSD

## OPINION AND ORDER

This matter is before the Court on Plaintiff Classic Harvest, LLC's ("Classic Harvest") Motion for Partial Summary Judgment [395] against Defendant AgriFact Capital, LLC ("AgriFact"), and AgriFact's Motion for Summary Judgment [430]. Intervening Plaintiffs Bengard Ranch, Church Brothers, LLC, D'Arrigo Bros. Co. of California, Eureka Specialties, Inc., Mann Packing Co. Inc., Pacific Sales Company, Tanimura & Antle, Taylor Farms California, Vaughan Foods, Inc., West Pak Avocado, Sunkist Growers, Inc., Market Express, Inc., and Williams Farms, LLC (collectively, the "Intervening Plaintiffs") (together with Classic Harvest, the "PACA Creditors") join in Classic Harvest's Motion for Partial Summary

Judgment. ([399], [400], [405]).[1] Also before the Court are Classic Harvest's

Motion to Strike AgriFact's Response to Classic Harvest's Statement of Material

Facts [416] ("First Motion to Strike"), AgriFact's Motion for Leave to File a

Corrected Response to Plaintiff's Statement of Uncontested Fact [426] ("Motion

for Leave"), and Classic Harvest's Motion to Strike AgriFact's Untimely Filed

Evidentiary Submissions and Response in Opposition to AgriFact's Motion for

Leave [429] ("Second Motion to Strike").[2]

---

[1]     Market Express, Inc. and Williams Farms, LLC's Motion for Joinder in
Plaintiff's Motion for Summary Judgment [399] is granted.

[2]     Classic Harvest's Motions to Strike and AgriFact's Motion for Leave are
frivolous, petty, and illustrate the parties' inefficient, and often burdensome,
conduct throughout this action.  In its First Motion to Strike, Classic Harvest
moves to strike parts of AgriFact's Response to Plaintiff's Statement of Material
Facts because, Classic Harvest asserts, they do not comply with Local Rule
56.1(B)(2)(a).  Local Rule 56.1(B)(2)(a) provides that the Court "will deem each of
the movant's facts as admitted unless the respondent" provides one of three
acceptable responses.  It does not permit a motion to strike a response.  When
AgriFact did not respond to its First Motion to Strike, Classic Harvest filed a
"Notice of Defendant AgriFact's Non-Opposition to Plaintiff's Motion to Strike"
[419] ("Notice").  Classic Harvest's First Motion to Strike, and to the extent it
seeks relief, Classic Harvest's Notice, are denied.

        In its Second Motion to Strike, Classic Harvest moves to strike a duplicate
filing of the August 17, 2016, Deposition of Linda Cunningham [411.7], [420.1],
and other late-filed deposition transcripts, excerpts of which were timely submitted
with AgriFact's response to Classic Harvest's Motion for Partial Summary
Judgment.  AgriFact moved for leave to file a "corrected" response to Classic
Harvest's Statement of Material Facts, to "delineate[] between the December 2015
and February 2017 Affidavits of Richard Kostkas" and "further clarif[y]
AgriFact's responses."  It is unclear why, nearly two (2) months late, AgriFact
filed the full transcript of certain depositions—for the first or second time—or why

Also before the Court is Classic Harvest's Motion for Reconsideration [361] of the Court's September 6, 2016, Order [342], which required AgriFact to maintain in a separate, segregated account, funds in the amount of identifiable Crisp PACA Trust Assets in AgriFact's possession. Resolution of the parties' motions for summary judgment will ultimately address AgriFact's liability, and Classic Harvest's Motion for Reconsideration is denied as moot.

## I.     BACKGROUND

This is an action under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a, et seq. When perishable agricultural commodities ("Produce") are sold, PACA imposes a nonsegregated, "floating" trust, in favor of Produce sellers, on the Produce sold, products derived from the Produce, "and any receivables or proceeds from the sale of such" Produce or product derived from it. 7 U.S.C. § 499e(c)(2). PACA requires the buyer to hold the trust assets "in trust for the benefit of all unpaid suppliers or sellers of such [Produce]," "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers . . . ." Id. A trust beneficiary may bring an action in federal court "to enforce payment from the trust." 7 U.S.C. § 499e(c)(5).

---

AgriFact delayed in seeking leave to "correct" its response. The Court will not consider any additional information submitted under the guise of an untimely "corrected" response. Classic Harvest's Second Motion to Strike and AgriFact's Motion for Leave are denied.

Crisp bought Produce on credit from wholesale Produce suppliers, including Classic Harvest and the Intervening Plaintiffs. Crisp then resold the Produce to its customers ("Account Debtors"), on credit, generating accounts receivable ("Receivables"). Under PACA, Crisp was required to hold, in trust (the "PACA Trust"), the Produce, products derived from the Produce, and the Receivables (the "Trust Assets"). These Trust Assets were required to be held for the benefit of Crisp's unpaid Produce suppliers, including Classic Harvest and the Intervening Plaintiffs.

On January 19, 2015, Crisp and AgriFact entered into a Factoring Agreement (the "Factoring Agreement"), under which Crisp "factored" to AgriFact certain of its Receivables in exchange for an immediate payment of 80%[3] of the face value of the Receivable, plus another payment after AgriFact collected on the Receivable, less AgriFact's fees and expenses, and other adjustments.

The Factoring Agreement functioned, in general, as follows: Crisp offers for "sale" to AgriFact a Receivable that meets certain pre-established requirements. (Factoring Agreement § 1.10). If AgriFact chooses to "purchase" the Receivable, Crisp "sells, transfers, and assigns," to AgriFact, Crisp's "right, title and interest in" the Receivable, and AgriFact pays to Crisp an "Advance," equal to 80% of the

---

[3] The amount of the Advance was later increased to 85%.

face value of the Receivable.  (Id. §§ 2.2.2, 2.3).  At the time a Receivable is

factored, AgriFact also establishes a "Reserve"—that is, approximately 20% of the

face value of each Receivable.  The Reserve generally consists of "all unfunded

purchase amounts,"[4] plus any outstanding fees and expenses Crisp owes to

AgriFact.  (Id. § 2.4).  AgriFact collects payment on the Receivable from the

Account Debtor and applies these payments first to amounts Crisp owes to

AgriFact under the Factoring Agreement, and then pays the remaining funds, if

any, to Crisp.  (Id. § 3.1).  In sum, after AgriFact collects on a Receivable,

AgriFact pays to Crisp a further amount based on the face value of the Receivable,

after deduction of AgriFact's fees, and, subject to limited exceptions, the amounts

AgriFact was unable to collect from the Account Debtor.  (See id. § 3.5).[5]

---

[4]    This would be the amount owed to Crisp by AgriFact in addition to the 80% of the face value paid.

[5]    At the end of each month, provided Crisp is not in default, AgriFact pays to Crisp a "Refund"—an amount equal to:

(a) the Reserve as of the beginning of that month, *plus*

(b) the Reserve created for each Receivable purchased during that month, *minus*

(c) the total for that month of:

    (i)    the Factoring Fee—that is, 0.063% of the face value of a Receivable, multiplied by the number of days the Receivable remained unpaid;

    (ii)   Adjustments—that is, all discounts, returns, disputes, counterclaims, or short payments asserted by an Account Debtor on a Receivable;

    (iii)  the Indemnification Obligation—that is, any amount, up to the full face value, or any unpaid portion thereof, of a Receivable that is the

From June 15, 2015, to August 14, 2015, Classic Harvest sold Produce to Crisp, for which Classic Harvest has not been paid.

Crisp closed its business on August 17, 2015. ([411.8] at ¶ 21).[6] On August 24, 2015, Classic Harvest sent a letter to AgriFact ("Demand Letter") which states that Crisp has breached its PACA trust obligations, including because Crisp "failed to pay invoices relating to qualified produce transactions in the current amount of $354,121.99" owed to Classic Harvest, and that Crisp likely "owes significantly more (i.e. in excess of $1.3M) to the holders of other properly preserved PACA trust claims." ([79.5] at 2). The Demand Letter states further that Crisp's Receivables are Trust Assets, and, until Classic Harvest and other PACA Creditors "are paid in full, the receipt of any PACA Trust assets by AgriFact [ ] is in violation of the PACA and such assets must be returned to the trust beneficiaries. . . . This written notice of breach of trust is sufficient to

---

subject of a dispute between Crisp and the Account Debtor regarding the quantity, quality or price of goods upon which a Receivable is based—to the extent AgriFact agreed to deduct it from the Refund; and

   (iv) the Reserve for the Account Balance—that is, the Reserve for the gross amount of all unpaid Receivables—as of the first day of the following month.

(See id. § 3.5).

[6] On August 17, 2015, David Gattis "advised parties, including Classic Harvest, that Crisp was ceasing operations." (Gattis Aff. [411.8] at ¶ 21). It is not clear when AgriFact was told that Crisp was closing its business.

undermine AgriFact's status as a bona fide purchaser for value, the only defense to

liability for either the receipt of, or participation in the dissipation of, a collection

of funds which are now known to be PACA trust assets." (Id. at 3).

To collect the amounts owed to it, on August 25, 2015, Classic Harvest filed

its Complaint [1] asserting claims against Crisp and its principals for breach of

their duties under PACA and to enforce the PACA Trust, including to recover

Trust Assets held by AgriFact. Classic Harvest also asserted a claim against

AgriFact for conversion and unlawful retention of Trust Assets.[7] Classic Harvest

claims that, under the Factoring Agreement, AgriFact improperly held and

collected proceeds from the Receivables which, Classic Harvest claims, were

subject to the PACA Trust and should have been used to pay the priority claims of

Crisp's PACA creditors.

On August 26, 2015, Classic Harvest moved for a preliminary injunction to

enjoin Defendants from using, consuming, or otherwise dissipating the Trust

Assets. (Mot. Prelim. Inj. [5]). Classic Harvest also requested that the Court

exercise *in rem* jurisdiction over the Trust Assets and establish a framework for

---

[7] On December 3, 2015, Classic Harvest filed its Amended Complaint, adding claims against AgriFact for aiding and abetting Crisp's principals' breach of fiduciary duty, unjust enrichment and replevin, and a claim against all Defendants for attorneys' fees and costs. The parties have not moved for summary judgment on these claims.

potential PACA creditors to submit their claims and share, on a *pro rata* basis, in the recovery of Trust Assets. (Id.).

On September 4, 2015, the Court entered the "Consent Injunction and Agreed Order Establishing PACA Claims Procedure" [24] (the "September 4th Order"). The September 4th Order provides for the Court to exercise exclusive *in rem* jurisdiction over Crisp's PACA Trust Assets, and further provides that any creditor who seeks to assert a claim to the Trust Assets must assert its claim in this action. The September 4th Order also provides: "Pending further orders of this Court, no banking institution . . . or other organization/entity (including, without limitation, AgriFact [ ]) holding funds for [Crisp] shall pay, transfer, or permit assignment or withdrawal of any existing PACA trust assets held on behalf of [Crisp]." (Sept. 4th Order ¶ 5). The September 4th Order set a hearing for October 22, 2015, to finalize and resolve any objections to the proposed PACA claims procedure.

On October 13, 2015, AgriFact filed its objections to the September 4th Order. AgriFact argued, among other things, that Paragraph 5 of the September 4th Order does not apply to the Receivables, and their proceeds, that were "factored" to AgriFact.

On October 22, 2015, the Court conducted a hearing to confirm the proposed PACA claims procedure. At the hearing, the Court considered AgriFact's objections and clarified that, under the terms of the September 4th Order, AgriFact is enjoined from transferring or otherwise expending any funds that it received from invoices it obtained from Crisp pursuant to the Factoring Agreement (the "Injunction"). The Court permitted AgriFact to file a motion to modify the Injunction, including to determine whether the Receivables are Trust Assets. The Court continued the hearing to January 14, 2016, to finalize and resolve objections to the proposed PACA claims procedure.[8]

On October 28 and November 13, 2015, AgriFact moved for reconsideration of the Injunction. ([54], [72]). On December 31, 2015, the Court denied in part and granted in part AgriFact's Motions for Reconsideration of the Injunction. The Court found that the Factoring Agreement did not function as a true sale of the Receivables to AgriFact, and because they remained Trust Assets, the Receivables and their proceeds were required to be made available for payment first to Crisp's unpaid PACA Creditors, including Plaintiff. (Dec. 31st Order at 25-26). The Court thus concluded that Plaintiff showed a substantial likelihood of success on

---

[8]     On January 14, 2016, the Court confirmed the PACA claims procedure proposed in the September 4th Order, as modified by the Court's October 23, 2015, Scheduling Order. ([115]).

the merits of its claim to recover Trust Assets from AgriFact.[9]  The Court denied

AgriFact's motions to the extent AgriFact sought to dissolve the Injunction against

it.  The Court, however, modified the Injunction to reflect only the amount of funds

that AgriFact may be required to disgorge—that is, the amount of funds necessary

to satisfy in full the unpaid PACA Creditors' claims, up to the limit of Trust Assets

AgriFact held while the PACA Creditors remained unpaid.  (Id. at 27-28).  The

Court required AgriFact "to maintain funds in a separate, segregated account,

sufficient to satisfy in full the unpaid PACA creditors' claims."  (Id. at 29).  The

Court later modified the Injunction further "to reflect that AgriFact is required to

maintain funds in a separate, segregated account, in the amount of identifiable

Crisp PACA Trust Assets in AgriFact's possession.  (September 6, 2016, Order

[342]).  The Court specified, however, that the modification of the Injunction "does

not affect the amount for which AgriFact may be liable if Plaintiff, and the other

PACA creditors, are successful on the claims they have asserted against AgriFact."

(Id. at 16).

---

[9]     The Court also found (i) that Plaintiff and the other PACA Creditors will
suffer irreparable harm in the absence of the Injunction, including because the facts
support that Trust Assets have been dissipated; (ii) that, in view of Crisp's closing,
the threatened injury of being unable to recover the Trust Assets is substantial and
outweighs the potential harm to AgriFact; and (iii) that, because the PACA trust is
intended to provide statutory protection for unpaid Produce supplies, the protection
of Trust Assets in the form of the Injunction serves the public interest.  (Id. at 27
& n. 16).

On May 31, 2017, the Court entered its order [436] evaluating the claims filed by the PACA Creditors in this case. The total amount of claims approved by the May 31st Order is $1,860,344.02.[10] (See Updated PACA Trust Chart [439.1]).

The parties filed cross-motions for summary judgment on the PACA Creditors' claim to recover Trust Assets from AgriFact.[11] The PACA Creditors argue that the Receivables were not sold to AgriFact and thus they remained Trust Assets, subject to the PACA Creditors' priority claims. The PACA Creditors assert that AgriFact is thus required to disgorge all Trust Assets up to the amount of the PACA claims asserted in this case. AgriFact argues that it is entitled to keep the Receivables, and their proceeds, because it purchased the Receivables from Crisp and the purchase did not breach the PACA Trust. AgriFact thus contended

[10]     This amount includes, for some PACA Creditors, the amount of attorneys' fees and interest claimed as of the date they filed their Proof of Claim in this action. A portion of Market Express's claim, in the amount of $136,835.50, requires further proceedings. To the extent AgriFact argues it is entitled to summary judgment because the PACA Creditors failed to prove their PACA claims, this argument is moot in view of the Court's May 31st Order.

[11]     On January 18, 2017, Classic Harvest moved for partial summary judgment against AgriFact. The Intervening Plaintiffs joined in Classic Harvest's motion. Three (3) months later, on April 24, 2017, AgriFact moved for summary judgment. It is not clear why AgriFact waited over three (3) months to file its motion for summary judgment, which, the Court notes, repeats many of the arguments AgriFact already presented in its several motions for reconsideration of the Injunction and in response to the PACA Creditors' motion for partial summary judgment. The Court, however, will treat the parties' motions as cross-motions for summary judgment on the PACA Creditors' claim to recover Trust Assets from AgriFact.

that the Receivables, and any amounts collected from them, are not Trust Assets.

AgriFact argues further that, even if the Receivables, and cash collected from

them, remained Trust Assets, AgriFact is not required to return them because

AgriFact is as a bona fide purchaser for value, and without notice of the breach of

trust.

## II.     DISCUSSION

### A.     Legal Standard

Summary judgment is appropriate where the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter

of law.  See Fed. R. Civ. P. 56.  The party seeking summary judgment bears the

burden of demonstrating the absence of a genuine dispute as to any material fact.

Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the

moving party has met this burden, the nonmoving party must demonstrate that

summary judgment is inappropriate by designating specific facts showing a

genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282

(11th Cir. 1999).  The nonmoving party "need not present evidence in a form

necessary for admission at trial; however, he may not merely rest on his

pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment. Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

B.    PACA Framework

PACA was enacted to regulate and "promote fair dealing" in the sale of Produce.  See Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable, 336 F.3d 410, 413 (5th Cir. 2003).  Produce sellers, "because of the need to sell their products quickly, were often unsecured creditors of buyers whose creditworthiness they were unable to evaluate before the sale."  Id. (citing Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1067 (2d Cir. 1995)).  "Due to a large number of defaults by the purchasers, and the sellers' status as unsecured creditors, the sellers recover, if at all, only after banks and other lenders who have obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables."  Endico Potatoes, 67 F.3d at 1067 (citing JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 77 (2d Cir. 1990); H.R. Rep. No. 543, at 3).  To "remedy such burden on commerce in [Produce] and to protect the public interest," PACA was amended to create a statutory trust for the benefit of unpaid Produce sellers.  See id.; 7 U.S.C. § 499e(c)(1).[12]

_____

[12]    7 U.S.C. § 499e(c)(1) states: "It is hereby found that a burden on commerce in [Produce] is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for [Produce] purchased . . . , encumber or give lenders a security interest in, such [Produce], or on inventories of food or other products derived from such [Produce], and any receivables or proceeds from the sale of such [Produce] or products, and that such

14

Section 499e(c)(2) imposes a nonsegreated "floating" trust on the Produce sold, products derived from the Produce, "and any receivables or proceeds from the sale of such [Produce] or product." 7 U.S.C. § 499e(c)(2). PACA requires the Produce buyer to hold the trust assets "in trust for the benefit of all unpaid suppliers or sellers of such [Produce]," "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers . . . ." Id. The trust allows Produce sellers "to recover against the purchasers and puts the sellers in a position superior to all other creditors," including secured creditors. See Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997) (citing Endico Potatoes, 67 F.3d at 1067).

The primary duty of a PACA trustee is to "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to [Produce] sellers . . . . Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [PACA]." See D.M. Rothman & Co., Inc. v. Korea Commercial Bank of N.Y., 411 F.3d 90, 94 (2d Cir. 2005) (quoting 7 C.F.R. § 46.46(d)(1)). "PACA regulations define 'dissipation' as 'any act or failure to act which would result in the diversion of trust assets or which could prejudice or impair the ability of unpaid . . . sellers . . . to

arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in [Produce] and to protect the public interest."

recover money owed in connection with produce transactions.'" Id. (quoting

7 C.F.R. § 46.46(a)(2)). "Thus, to determine whether a PACA trustee's actions or

omissions constitute a breach of fiduciary duty, [a court should] examine whether

the trustee 'in any way encumbered the funds or rendered them less freely

available to PACA creditors.'" Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d

701, 706 (2d Cir. 2007) (quoting D.M. Rothman, 411 F.3d at 99)).

General principles of trust law govern the PACA trust. C.H. Robinson Co.

v. Trust Co. Bank, N.A., 952 F.2d 1311, 1316 (11th Cir. 1992). A trustee may sell

trust assets unless the sale breaches the trust. See, e.g., Boulder Fruit Exp.

& Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d 1268, 1272

(9th Cir. 2001) (citing Restatement (Second) Of Trusts § 190). Because a PACA

trust is a nonsegregated, "floating" trust, a trustee "is permitted to convert trust

assets into other property, provided that the trustee honors its obligation to

'maintain trust assets in a manner that such assets are freely available to satisfy

outstanding obligations to [Produce] sellers.'" Nickey Gregory Co., LLC

v. AgriCap, LLC, 597 F.3d 591, 595-96 (4th Cir. 2010) (citing 7 C.F.R. § 46.46(b);

quoting 7 C.F.R. § 46.46(d)(1)); see also Boulder Fruit, 251 F.3d at 1271

("[N]othing in PACA or the regulations prohibits PACA trustees from attempting

to turn receivables into cash by factoring."). Thus, "a commercially reasonable

sale of accounts for fair value is entirely consistent with the trustee's primary duty under PACA and 7 C.F.R. § 46.46(d)(1)—to maintain trust assets so that they are freely available to satisfy outstanding obligations to [Produce] sellers." Boulder Fruit, 251 F.3d at 1271; see also Nickey Gregory, 597 F.3d at 595-96. When a trust asset is sold, the trustee necessarily relinquishes its interest in the asset and receives cash in return for it—that is, the asset sold is converted into cash and the asset itself is no longer a trust asset. The sale is not a breach of trust because the trust asset—now the cash—is "freely available" to satisfy the trustee's outstanding obligations to its PACA creditors.

Whether there was a true sale of the Receivables to AgriFact is the core issue here. Whether the Factoring Agreement constitutes a true sale of the Receivables determines whether AgriFact held the Receivables, and the proceeds collected from them, as Trust Assets subject to the priority interest of the PACA Creditors. See Nickey Gregory, 597 F.3d at 603.

C.      Whether the Receivables Remained Trust Assets

AgriFact and Crisp included in the Factoring Agreement language characterizing the transaction as a sale by Crisp of the Receivables to AgriFact. These characterizing terms are mainly stated in the Factoring Agreement's recitals:

> Whereas; [AgriFact] intends to enter into a Factoring Agreement in order to execute true purchases of [Crisp's] accounts receivable at a discount;[13] and
>
> Whereas; under the Factoring Agreement, [AgriFact] intends to assume the Credit Risk associated with any Purchased Receivables; and
>
> Whereas; [Crisp] intends to enter into a Factoring Agreement with [AgriFact] in order to relieve itself of Credit Risk to fully and timely comply with all of its payment obligations under [PACA] and, if any funds thereafter remain available, to be used to reduce overhead through outsourcing of accounts receivable related functions and otherwise operate and administer its business with greater efficiency.

(Factoring Agreement at 1). The Court notes, however, that "[s]ince recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement" and if the recitals and operative part are inconsistent, the operative part of the contract prevails. See A.S.D. v. W. Mun. Water Dist. of Riverside Cty., No. E030189, 2002 WL 31820335, at *8 (Cal. Ct. App. Dec. 17, 2002); cf. In re Woodson Co., 813 F.2d 266, 272 (9th Cir. 1987) ("Simply calling transactions 'sales' does not make them so. Labels cannot change the true nature of the underlying

---

[13]     Use of the term "true purchases" reflects that AgriFact and Crisp understood the requirement of a true sale and attempted to structure the transaction to exploit existing case law involving factoring agreements in the PACA context, including to avoid the protection the PACA trust offers to Produce sellers. See Endico Potatoes, 67 F.3d at 1068-69; Reaves, 336 F.3d at 417; Nickey Gregory, 597 F.3d at 604.

transactions."); <u>Rochester Cap. Leasing v. K & L Litho Corp.</u>, 13 Cal. App. 3d 697, 702 (Cal. Ct. App. 1970) ("In determining whether a transaction constitutes a loan, the significant consideration is the substance of the transaction rather than its form or the terminology used by the parties.").[14]

Whether the Factoring Agreement constitutes a true sale of the Receivables turns on "the substance of the relationship" between Crisp and AgriFact, "not simply the label attached to the transaction" by the parties. See <u>Reaves</u>, 336 F.3d at 414 (citing <u>Endico Potatoes</u>, 67 F.3d at 1068); cf. <u>Woodson</u>, 813 F.2d at 272. The key is whether it was a complete purchase for value, or whether the transaction provides for something less. See <u>Endico Potatoes</u>, 67 F.3d at 1068. In <u>Endico Potatoes</u>, the Second Circuit identified factors a court may consider in evaluating the substance of a factoring agreement involving PACA trust assets, including:

> the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt.

<u>Id.</u> As the Second Circuit explained, "*[t]he root of all of these factors is the transfer of risk.* Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the

---

[14]    It is undisputed that the Factoring Agreement is governed by California law.

performance of the accounts is direct, that is, the lender and not the borrower bears

the risk of non-performance by the account debtor." Id. at 1069 (emphasis added).

In contrast, "[i]f the lender holds only a security interest, however, the lender's risk

is derivative or secondary, that is, the borrower remains liable for the debt and

bears the risk of non-payment by the account debtor, while the lender only bears

the risk that the account debtor's non-payment will leave the borrower unable to

satisfy the loan." Endico Potatoes, 67 F.3d at 1069.[15]

---

[15]     AgriFact relies on In re Dryden Advisory Grp., LLC, 534 B.R. 612 (Bankr.
M.D. Pa. 2015), In re Commercial Loan Corp., 316 B.R. 690, 700-01 n.7 (Bankr.
N.D. Ill. 2004), and In re Golden Plan of Calif., Inc., 829 F.2d 705, 709 n.2 (9th
Cir. 1986), to support that the Court should adopt a "broader true sale test" that "is
governed by the intentions of the parties." (See [435] at 4). The Court disagrees.
In Dryden, the court listed several common factors courts consider in evaluating
whether a factoring of accounts receivable was a "true sale" or a financing
agreement, but stated, unequivocally, that, "[t]o classify a transaction accurately,
several attributes must be examined, primarily the allocation of risk." 534 B.R.
612 at 620. Dryden does not, as AgriFact appears to argue, support that any one
factor—including AgriFact's due diligence into the Account Debtors'
creditworthiness or that AgriFact collected directly from the Account Debtors—
"conclusively confirms" that the Factoring Agreement was a true sale.
        AgriFact relies on Commercial Loan to support that "courts should respect
the way the parties have chosen to describe their transaction and should ignore the
contractual description of a transaction as a 'sale' only in . . . rare instances . . . ."
Comm. Loan, 316 B.R. at 700-01 n.1. AgriFact, however, omits the "rare
instances" that exist here: "rare instances when the seller retains substantially all
of the benefits and burdens of ownership." Id. AgriFact's interpretation would
enable a PACA trustee and a third party to circumvent the legislative purpose of
PACA by characterizing a transaction as a sale, when it is less than that.
        Last, AgriFact argues that the true sale test "is governed by the *intentions*
of the parties," and thus the Court must consider uncontroverted testimony from

Here, the Factoring Agreement reflects an arrangement by which AgriFact

protected itself against the risk of nonpayment on the Receivables it "purchased"

by effectively limiting the circumstances under which it assumed the risk of loss,

and by maintaining the ability to impose the risk of loss on Crisp. AgriFact's

assumption of less than the full risk of loss is not consistent with a true sale of the

Receivables from Crisp to AgriFact. The Factoring Agreement terms discredit the

recitals that AgriFact "intends to assume the Credit Risk associated with any

Purchased Receivables." The purported shift of credit risk to AgriFact is plainly

---

AgriFact and Crisp that they "intended" that the Factoring Agreement result in a
true sale of the Receivables to AgriFact. (See [435] at 4-6 (quoting <u>Golden
Plan</u>, 829 F.2d at 709 n.2). The Ninth Circuit has consistently held that
"[w]hether a transaction is a sale or a loan is based on the intentions of the
parties 'as determined from all the facts and circumstances surrounding the
transactions at issue.' . . . We interpret <u>Golden Plan</u> to mean that testimony
should be admitted or excluded consistent with the ordinary rules regarding
parol evidence." <u>In re Comm. Money Ctr., Inc.</u>, 350 B.R. 465, 482 (B.A.P. 9th
Cir. 2006). Under California law, a contract "must be so interpreted as to give
effect to the mutual intention of the parties as it existed at the time of
contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code
§ 1636. "Such intent is to be inferred, if possible, solely from the written
provisions of the contract." <u>AIU Ins. Co. v. Superior Court</u>, 51 Cal. 3d 807, 822
(Cal. 1990). "If contractual language is clear and explicit, it governs." <u>Bank of the
West v. Superior Court</u>, 2 Cal. 4th 1254, 1264 (1992); <u>Cf.</u> <u>In re Berez</u>, 646 F.2d
420, 420-421 (9th Cir. 1981) ("The true nature of a transaction is determined by
the evidence and not by what the parties represent themselves to be doing."). Here,
the Court finds, and the parties do not dispute, that the Factoring Agreement is
clear and unambiguous. The Court thus does not consider testimony regarding
AgriFact or Crisp's intent.

qualified and one limited to "the risk of non-payment of a Purchased Receivable by an Account Debtor as a result of the financial inability to pay or creditworthiness." (Factoring Agreement § 1.8).

When nonpayment of a Receivable results from an Account Debtor's "financial inability to pay or creditworthiness," AgriFact was able to impose on Crisp the risk of loss, in whole or in part, based on certain circumstances. For example, if, at the time the Receivable was created, "notice of bankruptcy, insolvency, or adverse material change of the Account Debtor ha[d] been received by or [was] known to [Crisp,]" AgriFact may, in its sole discretion, deem its "purchase" of the Receivable void *ab initio*—that is, the "sale" never happened. (Id. §§ 1.10, 1.12). Under these circumstances, Crisp could be required to return the Advance AgriFact paid for any Receivable the "sale" of which AgriFact deemed void *ab initio*. Repayment of the "purchase" amount is not consistent with assumption of credit risk.

That the credit risk is not fully assumed by AgriFact is reflected in other Factoring Agreement provisions by which AgriFact was entitled to reduce the amount paid for a Receivable based on later-occurring events, even when nonpayment results from an Account Debtor's financial inability to pay, forcing the risk on Crisp. If Crisp knew that an Account Debtor would be unable to timely

pay its current payment obligations within ninety (90) days from an invoice date, AgriFact was authorized to require an "adjustment" to the Receivable. (Id. §§ 1.16, 6.1(h), 7). "Adjustments" are "all discounts, allowances, returns, disputes, counterclaims, offsets, defenses, rights of recoupment, rights of return, warrant claims *or short payments* asserted by or on behalf of any Account Debtor with respect to any Purchased Receivable," and are debited from any amount AgriFact otherwise was required to pay to Crisp at the end of each monthly period. (Id. §§ 1.3, 3.5). Under these post-factoring circumstances,[16] the risk associated with these Receivables, even if resulting from the Account Debtor's "financial inability to pay," was not a risk fully assumed by AgriFact.[17]

---

[16] Because invoices must be factored within 20 days of the invoice date, Section 6.1 effectively requires Crisp to guarantee an Account Debtor's financial ability to pay for a significant period of time after the invoice is factored. (Factoring Agreement §§ 1.10(a), 6.1).

[17] These two sections limit AgriFact's assumption of credit risk even when an Account Debtor is financially unable to pay, permitting AgriFact, at its election, either to void the purchase entirely, or reduce the amount paid for the Receivable, based on when the Account Debtor became insolvent. If Crisp knew, or should have known, that an Account Debtor was insolvent at the time a Receivable was factored, AgriFact may void its purchase entirely. (Factoring Agreement § 1.10). If Crisp knew, or should have known, that an Account Debtor would become insolvent within the 90 days from the invoice date, AgriFact may reduce the amount paid for a Receivable. (Id. §§ 6.1, 7). That Sections 6.1 and 7 require Crisp to guarantee an Account Debtor's financial ability to pay a Receivable for an additional period after the Receivable is factored further supports that this transaction is not a true sale.

The narrow definition of "Credit Risk" in the Factoring Agreement also shows that the assumption of risk in the factoring transactions does not support that the transactions were true sales. A plain example that AgriFact did not assume the ordinary risks associated with a true sale is evidenced by the terms providing that Crisp retained the risk of an Account Debtor's failure to pay a Receivable because it disputed the "quantity, quality or price of goods or services upon which Purchased Receivables are based." (Id. § 4.1). When this occurs, Crisp is required "to indemnify [AgriFact], on demand, up to the full face amount, or any unpaid portion thereof, of the Purchased Receivable. If [Crisp] is able to resolve the dispute with the Account Debtor, [Crisp] shall be entitled to retain any amounts received in excess of the amount [Crisp] has indemnified [AgriFact]." (Id.). Under this Factoring Agreement term, Crisp, as a practical matter, assumes the risk of nonpayment. A quality dispute thus results in the failure to collect on a Receivable and requires Crisp to remit funds to AgriFact to make up the shortfall, the amount of which may be the full face value of the Receivable. Under those circumstances, there was no sale at all.[18]

---

[18] Indemnification based on a later-occurring dispute as to the "quantity, quality or price of goods" is *in addition to* AgriFact's ability to deem void *ab initio* a Receivable that, on the date it was credited, is "subject to setoff, credit, allowance or adjustment by the Account Debtor" or for which the Account Debtor

These sections support that, even after the "sale" of Receivables to AgriFact, Crisp continued substantially to bear the risk of its customers' non-payment or underpayment on the Receivables AgriFact claims were "sold" to it. AgriFact's risk was limited to certain narrow circumstances under which a customer was financially unable to pay or was not creditworthy. Even then, the Factoring Agreement contains exceptions that further limit AgriFact's assumption of risk by allowing it to void the sale or reduce the amount paid for a Receivable. This arrangement by which AgriFact protected itself against the risk of nonpayment on the Receivables it purchased is wholly inconsistent with a "true sale" of the Receivables. See Endico Potatoes, 67 F.3d at 1069 ("Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor."); Reaves, 336 F.3d at 415 (finding similar factoring agreement was not a sale, including because "nonrecourse sales are qualified by two exceptions that are so significant that they essentially swallow non-recourse"); Nickey Gregory, 597 F.3d at 602 (where trustee was required to repurchase disputed invoices and "credit risk" was limited to insolvency, except where trustee knew account debtor

"retained the right to return any of the goods from the sale of which the account arose." (Factoring Agreement § 1.10(d)).

may become insolvent, agreement "effectively insulated AgriCap from loss" and was not a true sale); compare Boulder Fruit, 251 F.3d at 1272 (factoring agreement allowed trustee "to convert invoices that were not payable for 30 days (including uncollectible and invalid invoices) into cash," and trustee received more for invoices than factor was able to collect).[19] The arrangement here does not fall within the PACA provision that permits sale transactions that enable a trustee to convert receivables into cash by factoring, substituting cash for the trust asset receivable.

---

[19]    Other provisions support that the Factoring Agreement did not constitute a true sale of the Receivables but rather was a mechanism to protect AgriFact against credit risk that it necessarily would incur if a true sale had been made. That the amount of "outstanding" Advances is capped, and that Crisp must repay any Advances that exceed the cap, discredit AgriFact's assertion that the Advance is evidence of a true sale. (Factoring Agreement § 2.2.2). The fact of the Reserve also undercuts AgriFact's argument and further limits AgriFact's risk, including because the Reserve is in place to collect the Adjustments and any amounts Crisp is required to pay AgriFact in the event of a dispute related to the price, quality or quantity of goods upon which an invoice is based, and the Factoring Fee. (Id. § 3.5). That the Factoring Fee is calculated as a percentage of the face value of the Receivable for each day it remained unpaid—and during which period the Advance was "outstanding"—also supports that the Advance effectively functions as a loan, and the Factoring Fee is an interest payment for that loan. (Id. §§ 3.2, 3.5). Finally, that AgriFact would require Crisp to perfect a security lien in a "Purchased Receivable" discredits the argument that AgriFact considered the Receivables truly sold. (Id. § 2.2.1(e)(iii); see also [41.4] at 27; [67.1] at 106-109; [79.17] at 2-5). The "risk-minimizing features" of the Factoring Agreement, including its "reserve account," the uncertainty of the purchase price at the time of factoring, and lien and other security rights, supports that parties contemplated other than a true sale of the Receivables. See Reaves, 336 F.3d at 417; Nickey Gregory, 597 F.3d at 603.

The Court finds that the Factoring Agreement does not reflect a "true sale" of the Accounts Receivable to AgriFact. In the complex arrangement into which AgriFact entered with Crisp, AgriFact significantly insulated itself from the risk of loss that would result from nonpayment of Receivables it "purchased." That risk avoidance is not consistent with a trustee's duties under PACA or the policy goals PACA seeks to accomplish.[20] The Court concludes that the transaction did not function as a true sale of the Receivables. AgriFact was not a true purchaser of the Receivables, including because it did not fully assume the risk of nonpayment. Because they remained Trust Assets, the Receivables and their proceeds were required to be made available for payment first to Crisp's unpaid PACA Creditors. See 7 U.S.C. § 499e(c)(2); C.H. Robinson, 952 F.2d at 1313; Gargiulo, 131 F.3d at 999.

---

[20]    PACA's statutory trust provision reflects a policy decision to make the unsecured credit extended by Produce sellers superior to the position of lenders holding security interests in the Produce and the proceeds derived from its sale. In doing so, Congress recognized the difficulty lenders might have in administering their secured loans, and found that those concerns were outweighed by other considerations: "The Committee believes that the statutory trust requirements will not be a burden to the lending institutions. They will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that [Produce] will be paid for promptly and that there is a monitoring system provided for under [PACA] will protect the interests of the borrower, the money lender, and the fruit and vegetable industry. Prompt payment should generate trade confidence and new business which yields increased cash and receivables, the prime security factors to the money lender." H.R. Rep. No. 98-543 at 4.

The Factoring Agreement rendered the Trust Assets—the Receivables—less than freely available, including because AgriFact could require Crisp to refund amounts AgriFact paid to "purchase" the Receivable. That the value ultimately paid for an invoice was not known until after collection undercuts AgriFact's assertion that, based on payment of the Advance, the Factoring Agreement was a sale. At the time an invoice was factored and the Advance was paid, the ultimate value of an invoice was unknown, including because it may be subject to adjustment, prove uncollectable, or the purchase voided by AgriFact and the Receivable and its collection risk returned to Crisp. This uncertainty at the time of factoring and payment of the Advance, coupled with the parties' ongoing relationship and obligations, shows that the Accounts Receivable were not "freely available" to satisfy the outstanding claims of Crisp's PACA Creditors. See Boulder Fruit, 251 F.3d at 1271 (citing 7 C.F.R. § 46.46(d)(1)); see also Coosemans, 485 F.3d at 706 ("Thus, to determine whether a PACA trustee's actions or omissions constitute a breach of fiduciary duty, [a court should] examine whether the trustee 'in any way encumbered the funds or rendered them less freely available to PACA creditors.'") (quoting D.M. Rothman, 411 F.3d at 99). Put another way, the Factoring Agreement encumbered the Accounts Receivable and impaired the ability of Crisp's PACA creditors to recover funds they were owed as

beneficiaries of the PACA Trust. <u>See</u> <u>id.</u>[21] The arrangement between Crisp and

AgriFact violated the protections enacted by Congress to protect sellers of

perishable agricultural commodities.

In short, the Factoring Agreement did not function as a true sale, and thus

the Receivables, and the proceeds from them, continued to be PACA Trust Assets.

As a result, the amounts AgriFact advanced to Crisp did not reduce the value of the

Trust Assets, which were not freely available to satisfy the claims of the unpaid

PACA Creditors.[22] Permitting AgriFact to retain amounts it collected on the

Receivables after Crisp failed to pay its PACA Creditors would, in effect, advance

AgriFact's interest in the Trust Assets above the PACA Creditors. This is the

"imbalance" PACA intended to remedy. <u>See</u> 7 U.S.C. § 499e(c)(1); <u>Endico</u>

---

[21]　　When AgriFact later collected on the Receivable, the Receivable was
converted to cash, and the cash remained a PACA Trust Asset. AgriFact kept for
itself some of that cash, in an amount equal to the Advance it had paid to Crisp,
plus AgriFact's collection fees and interest. AgriFact then remitted the balance, if
any, to Crisp. It was the use of the cash to satisfy amounts Crisp owed to AgriFact
under the Factoring Agreement, before paying the PACA Creditors, that violates
PACA. <u>See</u> 7 U.S.C. § 499(b)(4), 499e(c)(2); 7 C.F.R. § 46.46(a)(2); <u>Nickey</u>
<u>Gregory</u>, 597 F.3d at 603-604.

[22]　　That AgriFact "advanced" funds to Crisp sufficient to pay the PACA
Creditors is not material to whether the Factoring Agreement breached the PACA
Trust. The PACA regulations do not ask whether a factoring agreement resulted in
a transfer of funds sufficient to pay suppliers throughout the course of the factoring
relationship. Rather, the question is whether an "act or failure to act . . . *could*
prejudice or impair the ability of unpaid . . . sellers . . . to recover money owed in
connection with produce transactions." 7 C.F.R. § 46.46(a)(2).

Potatoes, 67 F.3d at 1067. AgriFact is required to disgorge the amount of funds

necessary to satisfy in full the unpaid PACA Creditors' claims, up to the limit of

Trust Assets AgriFact held while the PACA Creditors remained unpaid. See

Nickey Gregory, 597 F.3d at 603, 607 n.2; Endico Potatoes, 67 F.3d at 1069; cf. In

re Gotham Provision Co., 669 F.2d 1000, 1010 (5th Cir. Unit B 1982) (applying

Packers and Stockyards Act, which contains statutory trust provision similar to

PACA, stating, "[w]here the packer has given a lender a security interest in

inventories or receivables that are subject to the [ ] trust, the unpaid cash sellers

have priority over those assets and may recover the proceeds of those receivables

to the extent of the outstanding balance on the cash sales").

### D.    AgriFact also is Not a Bona Fide Purchaser for Value

AgriFact next argues that, even if the Receivables are Trust Assets, AgriFact

is not required to return them because it took the Receivables as a bona fide

purchaser for value, and without notice of the breach of trust. A third-party

transferee may not be required to disgorge trust assets it received in breach of the

trust if it can show that it has some defense, such as having taken the assets as a

bona fide purchaser for value, without notice of the breach of trust. See Nickey

Gregory, 597 F.3d at 595-96; C.H. Robinson, 952 F.2d at 1313-15 ("Like any

transferee, secured lenders will be forced to return trust property they have

received unless they can establish their status as bona fide purchasers;" a bona fide purchaser of trust assets receives the assets free of any claim by the trust beneficiary); Reaves, 336 F.3d at 413 ("Consequently, unpaid sellers are not able to recover trust proceeds conveyed to a third party if that third party received the proceed 'for value' and 'without notice of the breach of trust.'") (citing Endico Potatoes, 67 F.3d at 1068). "To qualify as a bona fide purchaser, [AgriFact] has the burden of demonstrating that [Crisp] transferred the trust property 'for value' and that [AgriFact] was 'without notice' of the breach of the trust." Gargiulo, 131 F.3d at 999 (citing C.H. Robinson, 952 F.2d at 1314).

"A person has notice of a breach of trust only if he or she knew or should have known of the breach." Gargiulo, 131 F.3d at 1000 (citing C.H. Robinson, 952 F.2d at 1314; Restatement (Second) of Trusts § 297). "In the PACA context, once a lender has knowledge that the borrower/trustee was experiencing financial difficulties, or was failing to pay his or her suppliers, the lender has a duty of inquiry. If such an inquiry would have revealed the breach of the trust, then the person 'should have known' of the breach." Id. (citing Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1383 (3d Cir. 1994)). "The existence and the extent of a duty of inquiry depend on the character of the transaction and the character of the trust property." Id. (quoting Consumers

Produce, 16 F.3d at 1383).  "The lender must make the kind of inquiry as to debts

owed by the trustee to PACA beneficiaries that a reasonably prudent lender would

make as to debts owed by a similar borrower to a prior creditor who had rights

superior to those sought by the lender."  Albee Tomato, Inc. v. A.B. Shalom

Produce Corp., 155 F.3d 612, 617 (2d Cir. 1998).

Even assuming that the transfer of Trust Assets to AgriFact was "for

value,"[23] the undisputed facts show that, by August 24, 2015, AgriFact had notice

of the breach of trust.  On August 24, 2015, Classic Harvest sent AgriFact the

Demand Letter, which states that Crisp has breached its PACA trust obligations,

---

[23]    To the extent AgriFact continues to argue that payment of the Advance at
the same time, and in consideration for, transfer of the Receivable constitutes a
transfer "for value," this theory is foreclosed by the Court's holding that the
Factoring Agreement was not a "true sale" of Receivables.  See, e.g., Endico
Potatoes, 67 F.3d at 1068-69 (lender that accepted assignment of PACA supplier's
rights in receivables as "security" for loan was not a bona fide purchaser, but
merely a "secured party" whose interest in receivables was subject to unpaid
PACA creditors; lender did not "purchase" receivables where supplier continued to
bear risk of nonpayment); C.H. Robinson, 952 F.2d at 1315 ("[T]ransfers of trust
property such as accounts receivable are not for value under traditional trust law.").
AgriFact's bona fide purchaser defense appears to be based on the premise that
AgriFact received Trust Assets—the cash collected from the Receivable—for
value when AgriFact remitted funds to Crisp after collection, even though AgriFact
retained most of the cash to repay funds "advanced" to Crisp.  See Restatement
(Second) of Trusts § 304(3) ("If the trustee transfers trust property in consideration
both of the extinguishment of a *pre-existing debt* or other obligation *and of the
payment of money* . . . the transfer is for value.").  The Court need not decide this
issue because it finds that AgriFact fails to show that it was "without notice" of the
breach of the trust.  See Gargiulo, 131 F.3d at 999.

including because Crisp "failed to pay invoices relating to qualified produce transactions in the current amount of $354,121.99" owed to Classic Harvest, and that Crisp likely "owes significantly more (i.e. in excess of $1.3M) to the holders of other properly preserved PACA trust claims." ([79.5] at 2). The Demand Letter states further that Crisp's Receivables are Trust Assets, and that, until Classic Harvest and other PACA Creditors "are paid in full, the receipt of any PACA Trust assets by AgriFact [ ] is in violation of the PACA and such assets must be returned to the trust beneficiaries. . . . This written notice of breach of trust is sufficient to undermine AgriFact's status as a bona fide purchaser for value, the only defense to liability for either the receipt of, or participation in the dissipation of, a collection of funds which are now known to be PACA trust assets." (Id. at 3).

The undisputed facts show that, by August 24, 2015, AgriFact was aware that Crisp was not paying its PACA Creditors. (See Kostkas Aff. [93.1] at ¶ 44). After August 24, 2015, however, AgriFact continued to collect Crisp's Receivables, in the total amount of $758,974.93, and held an additional $89,412.80 in Receivables factored by Crisp to AgriFact, while the PACA Creditors remained unpaid. ([93.1] at 65-68).[24] AgriFact is not entitled to the bona fide purchaser

---

[24] Throughout this litigation, it has been undisputed that AgriFact is holding an additional $115,265.58, which consists of the cash "reserve" under the Factoring

defense for Trust Assets AgriFact held after August 24, 2015, and AgriFact's

Motion for Summary Judgment is denied. AgriFact is required to disgorge funds

in the amount of Trust Assets AgriFact held after August 24, 2015, while the

PACA Creditors remained unpaid.[25]

The PACA Creditors claim, however, that AgriFact knew, or should have

known, of the breach of trust before August 24, 2015, including because:

> (1) when negotiating the Factoring Agreement, Crisp gave AgriFact a copy of Crisp's accounts payable reports, which showed several hundred thousand dollars in payables, most of which was subject to PACA, more than 30 days outstanding ([64.2] at 13; [79.1], [79.3]);

> (2) AgriFact acknowledged that the Factoring Agreement was intended to "permit Crisp to pay its suppliers promptly" by "cut[ting] the lag period between Crisp's obligation to pay its suppliers, and the receivable's collection from Crisp's buyers" (Kostkas Aff. [411.1] at ¶ 47);

> (3) the Factoring Agreement requires Crisp to produce to AgriFact periodic financial statements, including to show that Crisp was complying with its PACA obligations (Factoring Agreement §§ 2.2.1(c)(iv), 6.2(k)(iii)); and

> (4) the only evidence in the record that Crisp sent any financial statement to AgriFact actually shows losses for the first three months of 2015, and a projected profit for April 2015 ([79.15] at 2-5; Kostkas Aff. [411.1] at ¶ 52).

---

Agreement, that is owed to Crisp and is a Trust Asset. ([54.1] at 47). AgriFact also is required to remit these funds.

[25] Because AgriFact returned to Crisp Trust Assets in the form of cash collected from the Receivables, in the amount of 15% or 20% of the Receivables less fees and interest, AgriFact is not required to disgorge those amounts.

The PACA Creditors argue that, had AgriFact conducted a reasonable inquiry into Crisp's ability to pay its creditors, including by requesting that Crisp comply with its obligation to periodically provide financial information to AgriFact, it would have shown that, throughout their factoring relationship, Crisp was permitting AgriFact to retain Trust Assets—the proceeds from the Receivables—while Crisp was not paying its PACA Creditors.

AgriFact contends that it did not know that Crisp breached the PACA Trust, or even that Crisp was having financial difficulties. AgriFact relies on the requirements it imposed upon Crisp under the Factoring Agreement to ensure that Crisp is complying with its PACA obligations. Under the Factoring Agreement, Crisp "represents, warrants, covenants and agrees" that:

> [Crisp] is in compliance with all obligations imposed on it by PACA and will use the proceeds of the Purchased Receivables first and foremost to maintain a current status on any of its PACA trust account payables.
>
> By tendering a receivable to [AgriFact], [Crisp] represents that it is not aware of any breach of the obligations of the PACA law, including the prompt payment obligations. . . . [Crisp] shall promptly notify [AgriFact] in the event [Crisp] is not current on [Crisp's] PACA obligations and shall not sell any Receivables to [AgriFact] until such time as [AgriFact] is not in breach of any PACA law obligations.

(Factoring Agreement §§ 6.2(e), (f)). AgriFact also relies on Kostkas's assertion that, "[t]hroughout the summer of 2015, [he] had various conversations with

Crisp's Chief Financial Officer Philip R. Coleman, and specifically questioned him about where Crisp stood with respect to its PACA claims. Mr. Coleman told [Kostkas] each time that all PACA claims were being paid." (Kostkas Aff. [411.1] at ¶ 53).[26]

The Court finds that there are genuine issues of material fact whether AgriFact knew, or should have known, of the breach of trust before August 24, 2015. When AgriFact knew that Crisp was experiencing financial difficulties or was failing to pay its PACA Creditors, and whether AgriFact's inquiry into Crisp's ability to pay its PACA Creditors was reasonable, are questions of fact that must be resolved by the jury.[27] At this stage of the litigation,

_____

[26] That some of the PACA Creditors believed Crisp was going to pay amounts it owed them is not material to whether AgriFact knew, or should have known, that it was receiving Trust Assets in breach of the PACA Trust. Congress chose to put the burden of due diligence on lenders, not produce suppliers: "The Committee believes that the statutory trust requirements will not be a burden to the lending institutions. They will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that [Produce] will be paid for promptly and that there is a monitoring system provided for under [PACA] will protect the interests of the borrower, the money lender, and the fruit and vegetable industry. Prompt payment should generate trade confidence and new business which yields increased cash and receivables, the prime security factors to the money lender." H.R. Rep. No. 98-543 at 4.

[27] The Court notes that it is not clear what, if any, financial statements Crisp produced to AgriFact during the factoring relationship. As of September 14, 2015, Crisp owed approximately $1,731,588.80 to its PACA Creditors, including $1,223,898.50 more than sixty (60) days overdue, with $633,103.28 more than ninety (90) days overdue. (See [41.1] at 20-23). It is likely that Crisp's inability to

on the record before it, the Court cannot find that no reasonable juror could conclude that AgriFact did not know of the breach of trust before August 24, 2015. That is, there is sufficient—albeit scant—evidence to allow a trier of fact to conclude that AgriFact did not know of the breach of trust before August 24, 2015. The PACA Creditors' Motion for Partial Summary Judgment against AgriFact on this issue is denied.

The Court finds that AgriFact is required to disgorge Trust Assets AgriFact held after August 24, 2015, which consist of (1) uncollected Receivables factored by Crisp to AgriFact, in the amount of $89,412.80, (2) funds AgriFact collected on the Receivables from Account Debtors, in the amount of $758,974.93, and (3) funds AgriFact held as the cash "reserve" under the Factoring Agreement, in the amount of $115,265.58. The amount AgriFact is required to disgorge may be reduced by the amount of funds, if any, AgriFact remitted to Crisp from payments Account Debtors made, after August 24, 2015, to AgriFact on the Receivables factored by Crisp. AgriFact is required to submit, on or before September 14, 2017, documents showing these payments to Crisp.

---

pay its PACA Creditors would have been apparent long before Crisp closed its business on August 17, 2015, and likely throughout its relationship with AgriFact. In the First Quarter of 2015, Crisp posted a gross loss of $813,445.97, and a net loss of $1,380,158.60. (See [41.1] at 17). In the Second Quarter of 2015, Crisp posted a gross loss of $202,508.96, and a net loss of $775,280.71. (Id.). It is not clear whether this information was provided to AgriFact.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Market Express, Inc. and Williams Farms, LLC's Motion for Joinder in Plaintiff's Motion for Summary Judgment [399] is **GRANTED**.

**IT IS FURTHER ORDERED** that Classic Harvest's Motions to Strike [416], [429], and AgriFact's Motion for Leave to File a Corrected Response to Plaintiff's Statement of Uncontested Fact [426], are **DENIED**.

**IT IS FURTHER ORDERED** that AgriFact's Motion for Summary Judgment [430] is **DENIED**.

**IT IS FURTHER ORDERED** that Classic Harvest's Motion for Partial Summary Judgment [395] against AgriFact, in which the Intervening Plaintiffs join, is **GRANTED IN PART**.  The motion is granted as to Trust Assets AgriFact held after August 24, 2015, including Receivables, their proceeds, and funds held as the "reserve" pursuant to the Factoring Agreement, and AgriFact is required to disgorge funds in this amount.  The motion is denied as to Trust Assets AgriFact held before August 24, 2015.

**IT IS FURTHER ORDERED** that, on or before September 14, 2017, AgriFact shall file with the Court a document showing, the amount of funds, if any,

AgriFact remitted to Crisp from payments Account Debtors made, after August 24, 2015, to AgriFact on the Receivables factored by Crisp.

**IT IS FURTHER ORDERED** that Classic Harvest's Motion for Reconsideration [361] of the Court's September 6, 2016, Order, is **DENIED AS MOOT**.

**SO ORDERED** this 7th day of September, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE